**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-00247-JLK

GREG LOPEZ,
RODNEY PELTON, and
STEVEN HOUSE,

      Plaintiffs,

v.

JENA GRISWOLD, Colorado Secretary of State, in her official capacity, and
JUDD CHOATE, Director of Elections, Colorado Department of State, in his official capacity,

      Defendants.

---

**MEMORANDUM OPINION & ORDER ON**
**MOTION FOR PRELIMINARY INJUNCTION**

---

Kane, J.

      Plaintiffs in this case—current gubernatorial and state senate candidates as well as a regular political campaign contributor—claim the contribution limits and the voluntary spending limits for state-office candidates found in Article XXVIII of the Colorado Constitution violate their First Amendment rights under the U.S. Constitution. Due to the imminence of the state elections, Plaintiffs request a preliminary injunction to prevent enforcement of the implicated provisions of Article XXVIII. After reviewing the related filings and presiding over a two-day hearing on the matter, I find the record is inadequate to support Plaintiffs' contention that they are entitled to the extraordinary and disfavored relief they seek. Consequently, I deny their Motion for Preliminary Injunction (ECF No. 8).

# I. BACKGROUND

Article XXVIII of the Colorado Constitution is the "primary campaign finance law in Colorado." *Colorado Ethics Watch v. Senate Majority Fund, LLC*, 269 P.3d 1248, 1253 (Colo. 2012). It was proposed by a citizen's initiative and adopted by popular vote in 2002. *Id.* According to its preamble, a primary purpose of the law is to address the reality that "large campaign contributions to political candidates create the potential for corruption and the appearance of corruption." Colo. Const. art. XXVIII, § 1. Article XXVIII places limits on the amount any "person, including a political committee" may contribute to a political candidate. *Id.* § 3(1). It also incentivizes candidates to voluntarily limit their campaign expenditures. *Id.* § 4. The law incorporates rules for adjusting both the individual contribution limits and the voluntary spending limits to account for inflation. *Id.* § 3(13), 4(7). Adjustments are "based upon the percentage change over a four[-]year period in the United States bureau of labor statistics consumer price index for Denver-Boulder-Greeley, all items, all consumers, or its successor index." *Id.* The indexed number is rounded down to the nearest twenty-five dollars. *Id.* The implementing regulations are updated to reflect current limits. Colo. Code Regs. § 1505-6, Rule 10.17.1(b) (2020).

Individual contribution limits are categorized into two tiers. Candidates in Tier 1 races—those running for governor, secretary of state, state treasurer, and attorney general—are limited to individual donations of $1,250 per election cycle.[1] Colo. Const. art. XXVIII, § 3(1); Colo.

---

[1] Section 2(6) of Article XXVIII defines an "election cycle" as any of the following:

> (a) The period of time beginning thirty-one days following a general election for the particular office and ending thirty days following the next general election for that office;

Code Regs. § 1505-6, Rule 10.17.1(b)(1). Colorado law allows candidates to accept and spend

contributions for both elections at any time during the election cycle. Colo. Rev. Stat. § 1-45-

103.7(3). Tier 2 candidates are those running for state senate, state house of representatives, state

board of education, regent of the University of Colorado, and district attorney. They are limited

to contributions of $400 per election cycle. Colo. Const. art. XXVIII, § 3(1); Colo. Code Regs. §

1505-6, Rule 10.17.1(b)(2).

Upon enactment of Article XXVIII by popular initiative in 2002, the contribution limit

for Tier 1 candidates was $1,000. That amount has increased by 25% in accordance with Article

XXVIII's inflation adjustment mechanism. Due to the mechanism's rounding-down requirement,

the limit for contributions to Tier 2 candidates has not changed since its addition to the Colorado

Constitution in 2002. The adjustment mechanism has been employed every four years, beginning

in 2007 and most recently in 2019. The contribution limits are scheduled for adjustment again in

the first quarter of 2023.

Section 4 of Article XXVIII establishes the framework for Colorado's voluntary

campaign spending limit option. It permits candidates to certify to the Secretary of State that they

will abide by specified spending limits for the applicable election cycle. By doing so, candidates

agree that their personal contributions are counted as political party contributions, and subjected

to the aggregate limits of such contributions. Candidates may advertise their compliance with the

---

(b) The period of time beginning thirty-one days following a general election for
the particular office and ending thirty days following the special legislative
election for that office; or

(c) The period of time beginning thirty-one days following the special legislative
election for the particular office and ending thirty days following the next general
election for that office.

voluntary spending limit. The agreement is irrevocable, except as set forth in § 4(4).[2] Participation is encouraged through § 5(5), which doubles the individual contribution limit for a particular election if (a) another candidate in the race for the same office has not agreed to the voluntary spending limit and (b) the non-accepting candidate has raised more than 10% of the voluntary spending limit. As mentioned previously, the spending limits are indexed to inflation by the same adjustment mechanism used for adjusting the contribution limits.

Plaintiffs Greg Lopez, Rodney Pelton, and Steven House bring this case against Defendants Jena Griswold, Colorado's Secretary of State, and Judd Choate, the Director of Elections, both in their official capacities (the "Government" or "Defendants"). Ms. Griswold administers Colorado's campaign finance laws, and Mr. Choate manages Colorado's Division of Elections.

Each plaintiff has been impacted by the contribution limits and voluntary spending limit option. Mr. Lopez is running for the office of governor, a Tier 1 candidacy. He is not a political newcomer. He ran for governor in 2018 and declared his most recent gubernatorial candidacy for that office on August 22, 2019. He testified that Colorado's contribution limit has made it "extremely challenging" to run an effective campaign because it limits his ability to travel and to utilize media. He has accepted maximum donations for the current race and has identified donors who would contribute more if they were not prohibited from doing so by § 3(1). Mr. Lopez has elected not to limit his campaign spending in accordance with § 4. He asserts he is being

---

[2] Section 4(4) of Article XXVIII provides: "If a candidate accepts the applicable spending limit and another candidate for the same office refuses to accept the spending limit, the accepting candidate shall have ten days in which to withdraw acceptance. The accepting candidate shall have this option of withdrawing acceptance after each additional non-accepting candidate for the same office enters the race."

punished for not doing so because his primary opponent—who has agreed to the spending limit of $3,395,275—is able to accept contributions twice as large as those Mr. Lopez can accept.

Representative Pelton is currently a state representative, having run successful campaigns for his seat in 2018 and 2020. On November 24, 2021, he declared his candidacy for the Colorado Senate, a Tier 2 race, to fill an open seat in Senate District 35 in the 2022 election. Like Mr. Lopez, he claims his campaign has been restricted by Colorado's low contribution limits. He testified to the difficulty of reaching his constituents in other counties when the rural district he seeks to represent as a state senator takes nearly five hours to drive across. He has not received any support from his political party for his current campaign. Although he elected to limit his campaign expenditures in accordance with § 4, he acknowledged at the hearing that he wasn't aware of what the actual spending limit was—$122,200—and did not "think that that kind of money would be spent" in his race. Despite agreeing to the voluntary spending limits, Representative Pelton is not able to capitalize on a doubled individual contribution limit, however, because his primary opponent also agreed to abide by the voluntary spending limit.

Mr. House is a Colorado resident who would like to contribute greater amounts to candidates in the current election cycle but is prevented from doing so by the individual contribution limits in Article XXVIII. He has a history of campaign contributions, including maximum donations to both Tier 1 and Tier 2 candidates. He testified that he has given the maximum amount allowed to a dozen or so candidates, and he would like to give more because he "care[s] about America" and he "want[s] to see people who have good ideas for how our state and country should operate be elected to office." He further asserts that donors such as himself are harmed when their contributions to a candidate who has not agreed to the voluntary spending

limit are restricted to a greater extent than the contributions of donors supporting a different candidate who has agreed to the spending limits.

Both Mr. Lopez and Representative Pelton hope to qualify for the primary ballot at a party assembly in early spring. Colorado has primary elections in June and statewide elections in November. In requesting a preliminary injunction, Plaintiffs claim that the need for relief is urgent and that the declaratory judgment they seek "would be little comfort" in "a year or so." Mot. for Preliminary Injunction at 4.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008). When presented with a motion for a preliminary injunction, courts in the Tenth Circuit consider whether: (1) the movant is substantially likely to succeed on the merits, (2) the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury to the movant outweighs the injury facing the opposing party under the injunction; and (4) the injunction is adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). When the Government opposes the motion, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). It is the movant's burden to establish that these factors weigh in favor of an injunction by a preponderance of the evidence. *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

Typically, a preliminary injunction serves the limited purpose of preserving the status quo ante[3] in order to prevent irreparable harm until a court can make a final decision on the

---

[3] Frequently, *status quo* is used as a shortened term for *status quo ante*, but the absence of the

merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Three forms of specifically disfavored preliminary injunctions go farther:  (1) those that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movants all the relief they could recover at the conclusion of a full trial on the merits. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004). Plaintiffs who seek a disfavored injunction must make a "strong showing" with regard to both the likelihood of success on the merits and the balance of harms. *Id.* at 976.

The status quo ante to be maintained or altered is the "last peaceable uncontested status existing between the parties before the dispute developed." *Beltronics*, 562 F.3d at 1070-71 (quoting *Schrier v. Univ. Of Colorado*, 427 F.3d 1253, 1260 (10th Cir. 2005)). Plaintiffs assert the last uncontested status was before the addition of Article XXVIII to the Colorado Constitution in 2002. They are flatly mistaken. The last uncontested status between these parties was that which existed before the earliest of the following events:  when Mr. Lopez or Representative Pelton was prohibited from accepting a donation in excess of the contribution limits in this election cycle; when either candidate felt compelled to limit his protected speech by agreeing to the expenditure limits; or when Mr. House was limited in the amount he could contribute to a candidate in the current election cycle. Whatever the date of the triggering event, the status quo ante was governed by the application and enforcement of Article XXVIII's campaign finance regime. By seeking to enjoin enforcement of Article XXVIII, Plaintiffs seek to alter the status quo ante.

---

last word, "ante," leads to a misperception that the term means the status "at present" rather than "before." *See Status Quo Ante*, Black's Law Dictionary (11th ed. 2019) ("The situation that existed before something else (being discussed) occurred.").

The requested preliminary injunction is also disfavored because it would likely afford Plaintiffs all the relief they could recover at a full trial on the merits.[4] Plaintiffs ask that I lift the contribution limits found in § 3 of Article XXVIII, and that I enjoin enforcement of the voluntary spending limits provisions in § 4. Such an injunction would leave Mr. Lopez and Representative Pelton's campaigns unfettered in their ability to solicit, receive, and spend funds at a crucial point in the election cycle. Party assemblies are weeks away, and primary elections are in approximately four months. Mr. Lopez and Representative Pelton would be well served to solicit contributions at the earliest possible moment. Representative Pelton might exceed the spending cap by which he is currently bound. Mr. House would be free to make individual contributions that far exceed current limits within minutes of an injunction being issued. This is precisely the relief these Plaintiffs sought by filing their Complaint.

Because Plaintiffs seek an injunction that would both alter the status quo ante and provide substantially all the relief they could recover at a full trial on the merits, the requested injunction is "historically" and "specifically disfavored." *O Centro*, 389 F.3d at 975. As such, Plaintiffs' Motion for a Preliminary Injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* As I explain below, the exigencies of the case do not support the extraordinary relief requested.

---

[4] Of course, were I to issue the requested preliminary injunction, it would be temporary and would not invalidate the challenged provisions of the Colorado Constitution and corresponding regulatory provisions for future elections. But at this stage in the election cycle, Plaintiffs would likely obtain all the relief they seek to impact their current campaigns.

### III. ANALYSIS

The First Amendment to the U.S. Constitution safeguards an individual's right to participate in public debate through political expression and political association. *See Buckley v. Valeo*, 424 U.S. 1, 15 (1976). Plaintiffs claim Colorado's Article XXVIII and the corresponding regulations infringe on these rights in two ways:  (1) through impermissibly low limits on individual contributions to candidates for Tier 1 and Tier 2 political offices and (2) through a coercive voluntary expenditure limits scheme. To obtain a preliminary injunction that will alter the status quo ante, Plaintiffs must make a strong showing that they are likely to succeed on the merits of their claims and that the harm they face outweighs the harm to the public interest. *O Centro*, 389 F.3d at 975-76. I consider each sequentially, but I stress three points before doing so.

First, what I find most convincing at this juncture is the Government's contention that this is a highly fact-intensive inquiry and that the type of "record evidence" upon which the Supreme Court relied in *Buckley v. Valeo* is lacking here. 424 U.S. at 31; *see also Randall v. Sorrell*, 548 U.S. 230, 249 (2006) (noting "courts . . . must review the record independently and carefully" when reviewing contribution limits). Plaintiffs seek an injunction against a constitutional amendment that is now 20 years old, and they support their request with precedent that clearly suggests that, under these circumstances, the Government must be given an opportunity to develop the factual record. The extraordinary relief Plaintiffs seek requires the record to "be more closely scrutinized" and that plainly cannot be done with an inadequate record. *O Centro*, 389 F.3d at 975.

The second point of emphasis is that when a litigant claims the Government has impermissibly impinged upon First Amendment rights, as Plaintiffs do here, "the Government

bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000). If it can carry that burden, then Plaintiffs are unlikely to succeed on the merits of their claims.

Third, I stress that there is no right to give or receive unlimited political contributions and no right to be free from having to make a choice regarding campaign financing. Generally, the Government may only restrict an individual's First Amendment rights of speech and association in order to achieve a compelling governmental interest and with the most narrowly tailored means available. *See, e.g.*, *Fed. Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464-65 (2007). The test for such restrictions by the Government is known as strict scrutiny.

The Supreme Court has made clear, however, that contribution limits and voluntary spending limits are subject to a less demanding standard. *See, e.g.*, *Randall*, 548 U.S. at 236-37. Plaintiffs reveal their significant misunderstanding of the law by "merging" an individual's desire to be free from the regulations at issue in this case with the enumerated right of speech and the derivative right of association. As Chief Justice Roberts said in *McCutcheon v. Federal Election Commission*, "*Buckley* recognized that 'contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities.' But it distinguished expenditure limits from contribution limits *based on the degree to which each encroaches upon protected First Amendment interests*." 572 U.S. 185, 196-97 (2014) (citation omitted). In other words, freedom from fundraising limits is not a First Amendment rights itself but instead is adjunctive to those rights. Therefore, it can be regulated so long as the result of such regulation does not thwart the First Amendment rights themselves. The former is subject to the rule of reason defined by the Supreme Court, and the latter are the qualities entitled to protection.

*A. Likelihood of Success on the Merits—Campaign Contribution Limits*

The Supreme Court has stated and reiterated that "[a] limitation on the amount of money a person may give to a candidate or campaign organization" leaves the First Amendment rights of communication and association "significantly unimpaired." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 386–87 (2000) (quoting *Buckley*, 424 U.S. at 21). Later, in *Randall v. Sorrell*, it drew a line in the sand:  Contribution limits may not be so low that they "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." 548 U.S. at 249.[5]

*Randall* set out a procedure for determining whether contribution limits are too low. First, a court must assess whether certain "danger signs" indicate the electoral process is at risk. *Id.* Contribution limits that are substantially lower than limits previously upheld and those that are substantially lower than comparable limits in other states indicate a risk to the electoral process. *Id.* at 253. If both danger signs exist, courts "must review the record independently and carefully" to assess whether the limits are closely drawn to a sufficiently important governmental interest. *Id.* at 249 (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)).

In nearly fifty years of Supreme Court precedent, the only sufficiently important interest identified for limiting campaign contributions is that of preventing the appearance or actuality of quid pro quo corruption. *See McCutcheon*, 572 U.S. at 192. *Randall* offers five factors for assessing whether a contribution limit is closely drawn to the Government's interest in

---

[5] *Randall* is a plurality decision in which there was no agreement by a majority of Justices as to the specific standard to be applied when reviewing contribution limits. Its guidance was therefore advisory for a number of years. The Supreme Court recently adopted Justice Breyer's analysis in *Randall* in a *per curiam* opinion. *See Thompson v. Hebdon*, 140 S. Ct. 348 (2019).

preventing corruption or its appearance: (1) whether the limit will significantly restrict the amount of funding available for challengers to run competitive campaigns; (2) whether the limit also applies to political parties; (3) how the law establishing the limit treats volunteer services; (4) whether the limit is adjusted for inflation; and (5) whether there is any special justification for the limit. 548 U.S. at 253-61.

I begin with the danger signs. In Colorado, campaign contribution limits are currently $1,250 per election cycle for Tier 1 candidates and $400 per election cycle for Tier 2 candidates. Defendants concede both danger signs are present for the Tier 2 limit but do not for the Tier 1 limit. *See* Resp. to Mot. for Preliminary Injunction at 6. Nevertheless, it is not a close call. When adjusted for inflation, the Tier 1 limit is lower than limits previously upheld by the Supreme Court for statewide offices. *See Buckley*, 424 U.S. at 7 ($5,056); *Shrink*, 528 U.S. at 383 ($1,790).[6] And while the parties dispute which states have comparably lower limits, there is no question that Colorado's limit for statewide races is among the lowest and there is also no requirement that it be at the very bottom of the list before a red flag is raised. *See Thompson*, 140 S. Ct. at 351. Thus, the danger signs are likely present for both Tier 1 and Tier 2 limits.

Continuing the *Randall* analysis, I next consider whether the limits are closely drawn to a sufficiently important governmental interest. Defendants do not mince words regarding the interest at stake: "Colorado has a sufficiently important government[al] interest in deterring corruption and the appearance of corruption. The people of Colorado have spoken emphatically that this is an interest of theirs, having enacted numerous campaign finance measures by initiative." Resp. to Mot. for Preliminary Injunction at 8. Plaintiffs assert the "anti-corruption

---

[6] These amounts were calculated through the Bureau of Labor Statistics' inflation calculator, which calculates a sum's present value as of January 2022. Bureau of Labor Statistics, CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl.

rationale in support of Article XXVIII [is] an inappropriate post-hoc justification." Mot. for Preliminary Injunction at 23. Without more evidence, this assertion cannot be countenanced. Further, I cannot discount the fact that the very first statement of the constitutional amendment, supported and adopted by a majority of Colorado voters, "declare[s] that large campaign contributions to political candidates create the potential for corruption and the appearance of corruption." Colo. Const. art. XXVIII, § 1. Satisfied that a sufficiently important governmental interest is involved, I go on to apply the five *Randall* factors to assess whether Defendants are likely to prove that the contribution limits are closely drawn to that interest.

First, the evidence presented suggests that the individual contribution limits do not significantly restrict the amount of funding available for challengers to run competitive campaigns. Plaintiffs point to the rise in the average cost of a competitive race "from about $82,000 to over $232,000 in just twelve years." Mot. for Preliminary Injunction at 11. That fact provides meager information, saying nothing about the source or effectiveness of these campaign funds. For example, Plaintiffs identify television as being the most expensive and one of the most preferred methods of mass communication, but their expert witness on campaign financing and spending, Professor Seth Masket, described door-to-door campaigning by volunteers as being more effective than television advertising.

In Colorado, individuals may contribute unlimited amounts to independent expenditure committees, which in turn can spend unlimited amounts in support of candidates. Plaintiffs' expert witness on political party functioning and candidate races in Colorado, Benjamin Engen, explained that incumbents are far less likely than challengers to receive money from such special interest groups. Professor Masket offered a regression analysis to demonstrate that a challenger's

chances of success increase by 3% if he outraises an incumbent.[7] But, on cross-examination, he admitted that the analysis does not account for spending by outside groups. Ultimately, Professor Masket conceded the possibility that an increase in the contribution limits might result in an increased advantage to incumbents.

Defendants' expert on campaign finance data and statistics, Professor Douglas Spencer, offered a compelling counterpoint to the testimony by Plaintiffs' expert witnesses. When asked to address trends in incumbency win rates for legislative candidates over a particular timeframe, he candidly admitted that the two weeks he had been given to review data was wholly insufficient. He explained:

> If I had more time, I would try to get as many years['s worth of data as possible] and do what's called a cross-sectional time series so not only are we looking at the time series in Colorado but comparing that time trend to the trend in Montana and the time trend in New Hampshire because it's not even just what's happening in Colorado. Colorado politics are impacted by what's going on in the country.

With additional time, Professor Spencer testified, he would "find more data and . . . more controlled variables [] to figure out whether or not [his] top line opinions hold," and he would compare the trends in Colorado to those of other states. It is precisely that type of analysis that would help the court determine whether Colorado's contribution limits prohibit challengers from running competitive campaigns. Without solid evidence in the record that challengers cannot run competitive campaigns under current contribution limits, this factor must tilt in the Government's favor.

---

[7] Plaintiffs moved to admit four exhibits at the hearing and I admitted them conditionally, reserving Defendants' objections until the conclusion of the evidence. Although no specific objections were made, Defendants assailed the reliability of the proffered exhibits on cross-examination. I now admit Exhibits 2-5, but my doubt as to their reliability and accuracy highlight why a full record is necessary before any relief is granted in this case.

As for the second *Randall* factor, the limits for political parties to donate to candidates is significantly higher than the individual limits: a political party can contribute $697,025 to a gubernatorial candidate—an amount that exceeds the combined contribution limits of 1,000 individual donors. *See* Colo. Code Regs. § 1505-6, Rule 10.17.1(h). Other Tier 1 candidates can receive up to $135,775. *Id.* While party limits for donations to Tier 2 candidates are lower, they are all five-figure sums that dwarf the $200 limit for party contributions to a candidate found unconstitutional in *Randall*. 548 U.S. at 256-57 (determining Vermont's $200 limit for party contributions "threaten[ed] harm to a particularly important political right, the right to associate in a political party"). At the hearing, Plaintiffs presented evidence that political parties are limited in their ability to give at such high amounts and that due to restrictions on contributions to political parties, *see* Colo. Const. art. XXVIII, § 3(3), the availability of large contributions from political parties is illusive, particularly to candidates in smaller races. The parties offered contrasting statistics about the actual amounts given by political parties to challengers in competitive races and the circumstances under which they are given. Their disagreement only reinforces my belief that the record begs further development. This consideration also suggests the law is sufficiently tailored.

Third, a more complete record will assist the court in evaluating the impact of Article XXVIII's treatment of volunteer services. For now, it is enough to compare the treatment of volunteer services under Colorado law to the laws impacting volunteers in *Randall*. Here, as in *Randall*, a volunteer's expenses are counted against his campaign contribution limit, but the concerns expressed there are not present here. In *Randall*, the law addressing volunteer expenditures encompassed "anything of value, paid . . . for the purpose of influencing an election" that was "intentionally facilitated by, solicited by or approved by the candidate."

*Randall*, 548 U.S. at 259. The Court noted that a volunteer's travel expenses could quickly exceed the contribution limit. *Id.*

Under Colorado law, though, the relevant definition of a contribution is "[a]nything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's . . . election." Colo. Const. art. XXVIII, § 2(5)(a)(IV). Travel expenses are not given to a candidate directly or indirectly because such a "contribution" requires that "(1) a thing of value (2) be put into the possession of or provided to a candidate or someone acting on the candidate's behalf (3) with the intention that the candidate receive or make use of the thing of value provided (4) in order to promote the candidate's election." *Keim v. Douglas Cnty. Sch. Dist.*, 399 P.3d 722, 729 (Colo. App. 2015). Plaintiffs have not shown how travel expenses can be "put into the possession of or provided to a candidate," and therefore counted against a volunteer's contribution expenses.

In *Randall*, the Court expressed particular concern that the contribution limits were not indexed to inflation—the fourth factor. *Id.* at 238. Here, Article XXVIII includes an inflation adjustment mechanism. The system is not perfect. Plaintiffs identify a concerning trend in the limits, particularly the Tier 2 limit which has remained static despite a 55% increase in the consumer price index since 2002. Though not as stark a comparison, distance steadily grows between the consumer price index and the Tier 1 limit, which has increased only 25% in 20 years. But, as the Government points out, Plaintiffs have filed suit in the last quarter of the inflation adjustment period, thereby skewing the comparison in their favor. While the failure of the inflation adjustment mechanism to affect the Tier 2 limit *at all* since the law's passage is troublesome, that fact alone does not tilt this factor in Plaintiffs' favor at this early stage in the litigation. A fully developed factual record is necessary to put this amount into proper perspective.

No special justification is given for Colorado's particular contribution limits, so I do not address the fifth *Randall* factor.

The Government has offered a sufficient basis to conclude that at least three factors favor a finding that the limits established in Article XXVIII are tailored to the important interest of avoiding "the potential for corruption and the appearance of corruption," and that its individual contribution limits are therefore likely constitutional. Colo. Const. art. XXVIII, § (1). Even more convincing, however, is the Government's emphasis at the hearing that this is a fact-intensive case and "there just hasn't been the opportunity yet for the parties to develop . . . a sufficient record based on adequate expert testimony [and] adequate factual witness opportunity."

*B. Likelihood of Success on the Merits— Voluntary Spending Limits*

Plaintiffs are also unlikely to prevail on the merits of their second claim related to voluntary spending limits for candidates. To assess whether a voluntary spending limit option is constitutional, I must first determine whether § 4 of Article XXVIII burdens the rights of speech and association. *Buckley*, 424 U.S. at 44. If it does, the constitutionality of § 4 "turns on whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44-45.

Provisions in a statute that regulate speech must be differentiated from those that regulate campaign finance generally. Plaintiffs' earliest argument at the preliminary injunction hearing was that "corruption is the only rationale for campaign finance regulation." That assertion is overly simplistic. Corruption is the only recognized rationale for campaign finance regulations that *burden the rights of speech and association*. True, a statutory scheme that coerces candidates into limiting their campaign expenditures indubitably burdens the First Amendment rights. *See*

*Buckley*, 424 U.S. at 23 (explaining "expenditure ceilings impose . . . severe restrictions on protected freedoms"). A statutory *choice* to limit campaign speech that is offered to all candidates without discrimination entails no such burden. There is no inherent constitutional defect in a law's choice-increasing framework when, as here, it does not burden a candidate's First Amendment rights.

In Colorado, candidates may limit the quantity of their political speech through an agreement to limit their campaign spending. If they do so, they can advertise freely and perhaps gain support from the portion of the electorate that supports such limits. They may also benefit from larger contributions. The doubled contribution limit is not guaranteed, however, as an agreement to abide by the voluntary spending limit from every candidate in the race returns the maximum contribution to the lower limit. Alternately, a candidate may decline both the potential advantages and the potential risks by choosing to leave their political speech unbridled.

Take, for example, a gubernatorial candidate such as Mr. Lopez. At the time he files a candidate affidavit, Mr. Lopez can choose to certify to Colorado's Secretary of State his acceptance of the statutory spending limit for his race:  approximately 3.4 million dollars. He may then advertise his decision. Once another candidate who does not agree to abide by the voluntary spending limits enters the race, Mr. Lopez has ten days to withdraw his acceptance, or he can begin accepting individual contributions of $2,500 per election cycle rather than $1,250, so long as his opponent has raised more than ten percent of the voluntary spending limit ($340,000). But Mr. Lopez runs a risk:  If Mr. Lopez's opponent also agrees to the voluntary spending limit—and no other opponent refuses—then no candidate benefits from doubled individual contribution limits. In effect, Mr. Lopez risks agreeing to limit his speech without the corresponding benefit of increased contribution limits.

By describing this statutory scheme as coercive, Plaintiffs suggest the carrots offered in exchange for accepting the limits hold such great appeal that candidates don't have a meaningful choice. Or, on the other side of that coin, they suggest the sticks threatening those who do not agree to limit their expenditures are so fearsome they cannot be endured. But I have already determined that the contribution limits are likely constitutional, so I can hardly call it a form of punishment to abide by them. What's more, neither the appeal of the incentives nor the fear of the political ramifications is great enough to convince even half of Colorado candidates to agree to spending limits. In 2018, one quarter of the Tier 1 candidates and one third of Tier 2 candidates elected to abide by the voluntary expenditure limits. Bouey Decl. ¶ 6, ECF No. 14-1.

Plaintiffs point out that a candidate might agree to the spending limits as a defensive strategy because it would preclude his opponent from potentially benefitting from doubled contribution limits. They complain they are penalized for making use of this tactic by the concomitant limit on the quantity of political speech. Alternately, they claim they would be penalized for not availing themselves of the tactic because their opponent could then raise funds at a faster clip. Plaintiffs argue that either penalty constitutes an unconstitutional abridgment of their rights under the First Amendment. This argument proves too much. Again, there is no First Amendment right to be free from having to make a choice regarding campaign financing. Indeed, each candidate must pursue some strategy throughout his campaign, and each strategy is likely to catalyze a response that could impact his chances of election. Plaintiffs fail to see the interconnectedness of their campaign speech with that of their opponents and with the public interest. That failure is embodied in Plaintiffs' refusal to acknowledge that an opponent who can benefit from increased contribution limits may later be hampered by the campaign expenditure cap.

While it is true the Supreme Court has never condoned the creation of different contribution limits for opposing candidates, see *Riddle v. Hickenlooper*, 742 F.3d 922, 929 (citing *Davis v. Fed. Election Commission*, 554 U.S. 724, 738 (2008)), Section 4's differing contribution limits are not foisted upon specified classes of candidates—they are selected at will by the candidates. The fact that Mr. Lopez and Representative Pelton have made different choices despite their shared frustration with the statutory scheme is evidence that candidates are free to choose though they may not like the political ripples caused by that choice. On the record as it stands, I find that Defendants are likely to demonstrate the constitutionality of this choice-increasing framework at trial.

*C. Irreparable Injury*

The inquiry into Plaintiffs' alleged irreparable injury melds into the inquiry on their likelihood of success on the merits. While "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), I have found that Plaintiffs' loss is speculative as they are unlikely to succeed on the merits of their First Amendment claims. Plaintiffs offer no argument that any other form of harm is imminent. Accordingly, I find Plaintiffs are not likely to suffer irreparable injury in the absence of a preliminary injunction.

*D. Harm to the Public Interest*

Plaintiffs seek to enjoin a decades-old law on an expedited basis, without a fully developed factual record. The public has a significant interest in not suffering the reverberations

of a federal court order that declares a constitutional referendum unconstitutional on the basis of an incomplete record. This is particularly true when the law concerns campaign finance regulation—an inherently fact-intensive subject under Supreme Court jurisprudence—and when the injunction is sought just as the election cycle erupts into life.

Moreover, the approval of the referendum imposing the constitutional limits by Colorado voters is indicative of their perception of corruption or the appearance of it. The harm produced by corruption or its appearance to the common interests of all citizens is self-evident. One would have to ignore the traditions and expressed values of this nation from its inception to conclude otherwise. The balance of harms lies squarely in favor of the public's interest.

## IV. CONCLUSION

For the reasons provided in this Order, Plaintiffs' Motion for Preliminary Injunction (ECF No. 8) is DENIED.

DATED this 10th day of March, 2022.

_____

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE