IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00247-JLK

GREG LOPEZ,
RODNEY PELTON, and
STEVEN HOUSE,

      Plaintiffs,

v.

JENA GRISWOLD, Colorado Secretary of State, in her official capacity, and
JUDD CHOATE, Director of Elections, Colorado Department of State, in his official capacity,

      Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT TWO

---

      Colorado gives its candidates for state office a choice: spend unlimited money in your campaign using Colorado's default contribution limits or accept contributions of up to double the normal limit in exchange for voluntarily limiting your spending. Plaintiffs argue this system violates their First Amendment rights to speech and association. But federal courts—including this one—have recognized that such choice-increasing campaign finance laws are constitutional and actually further First Amendment interests by allowing each candidate to make their own speech-maximizing choice. Plaintiffs' First Amendment rights thus are not burdened at all, let alone violated. Nor is there any hint that Colorado's system coerces candidates into limiting their spending—to the contrary, only about one out of three candidates choose the spending limits in any given election cycle.

      There is no genuine dispute of material fact concerning Colorado's voluntary spending limits, and Defendants are entitled to summary judgment on that claim.

## STATEMENT OF CONFERRAL

Counsel for Defendants conferred with Plaintiffs' counsel regarding this motion. Plaintiffs oppose the relief sought in this motion. The parties agreed that the briefing schedule set forth in D.C. Colo. LCivR 56.1 should apply, allowing 21 days for a response and 14 days for a reply.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Colorado's voluntary spending limits

1.      When a candidate for statewide office files an affidavit of candidacy, the candidate must also declare whether he or she accepts or declines Colorado's voluntary spending limits. Colo. Const. art. XXVIII, § 4(3); Ex. A at 143:18-144:4.

2.      Candidates who agree to the voluntary spending limits may accept contributions twice as large as the otherwise applicable limits, if (1) another candidate in the same race declined voluntary spending limits, and (2) the declining candidate has raised more than 10% of the voluntary spending limit. Colo. Const. art. XXVIII, § 4(5); Ex. A at 144:8-145:1. This constitutional provision is cited throughout this motion as "Section 4(5)."

3.      In addition to accepting higher contributions, candidates who agree to the voluntary spending limits "may advertise their compliance." Colo. Const. art. XXVIII, § 4(6).

4.      If a candidate accepts the spending limits and another candidate joins the race who declines the limits, the accepting candidate may choose to withdraw from the spending limits within ten days of the new candidate joining the race. Colo. Const. art. XXVIII, § 4(4); Ex. A at 144:8-145:1.

5.      Voluntary spending limits are adjusted for inflation every four years. Colo. Const. art. XXVIII, § 7. The current voluntary spending limits are published in the Secretary of State's rules.

6.      The voluntary spending limits in effect for the 2022 election cycle were:

    a.   $3,395,275 for Governor;

    b.   $679,025 for Secretary of State, Attorney General, and Treasurer;

    c.   $122,200 for State Senate; and

    d.   $88,225 for State House and other offices.

*See* 8 Colo. Code Regs. § 1505-6:10.17.1(i) (eff. 9/30/2020), *available at*

https://tinyurl.com/5xd2tmwt.

7.      The current voluntary spending limits are:

    a.   $3,945,300 for Governor;

    b.   $789,025 for Secretary of State, Attorney General, and Treasurer;

    c.   $141,975 for State Senate; and

    d.   $102,500 for State House and other offices.

*See* 8 Colo. Code Regs. § 1505-6:10.17.1(j) (eff. 4/13/2023), *available at*

https://tinyurl.com/5xd2tmwt.

8.      In 2014, 94 out of 311 candidates for state office (30.2%) accepted voluntary spending limits. Ex. B at Interrogatory 7.

9.      In 2016, 112 out of 326 candidates for state office (34.4%) accepted voluntary spending limits. *Id.*

10.     In 2018, 139 out of 391 candidates for state office (35.5%) accepted voluntary spending limits. *Id.*

11.     In 2020, 133 out of 360 candidates for state office (36.9%) accepted voluntary spending limits. *Id.*

12.     In 2022, 149 out of 398 candidates for state office (37.4%) accepted voluntary spending limits. *Id.* at Errata.

### Senator Pelton

13.     Plaintiff Rodney Pelton is the current senator for State Senate District 35, having won the 2022 general election for that seat. Ex. C at 9:18-20; Ex. D at 122:9-12.[1]

14.     Pelton accepted voluntary spending limits for the 2022 election. Ex. C at 10:4-6.

15.     Pelton "do[es] not know" why he accepted voluntary spending limits and is "not fully versed" on how they operate. *Id.* at 10:14-19, 11:6-11.

16.     Pelton also didn't even know what the applicable spending limit that he agreed to was. Ex. D at 131:8-16.

17.     In March 2022, Pelton did not believe a candidate in his senate race would spend more than $122,200, the applicable spending limit. *Id.* at 133:16-21.

18.     Pelton's total expenditures for the 2022 election cycle were $33,243.54, or 27% of the applicable voluntary spending limit. Ex. C at 12:6-12; Ex. E.

---

[1] Ex. D is the transcript of the March 9, 2022 preliminary injunction. Admissible evidence from that hearing "becomes part of the trial record," Fed. R. Civ. P. 65(a)(2), and may be considered on this motion for summary judgment. *See Franks v. Nimmo*, 697 F2d 1230, 1237 n.3 (10th Cir. 1986) (testimony at preliminary injunction hearing "clearly falls within the scope of Rule 56").

19.     Pelton won his election for the Colorado Senate with 74% of the vote. Ex. C at 9:18-20.

20.     Pelton did not feel coerced into accepting voluntary spending limits. *Id.* at 20:7-10.

### Greg Lopez

21.     Plaintiff Greg Lopez was a candidate in the Republican primary for Governor of Colorado in 2022. Ex. D at 136:20-24.

22.     Lopez did not accept voluntary spending limits for his 2022 race. *See* Dec. of Greg Lopez [Doc. 8-1], filed Feb. 7 2022, at ¶ 12.

23.     Lopez lost the 2022 primary. Ex. F at Request for Admission 1.

24.     Lopez spent $154,024.40, just 4.5% of the voluntary spending limit, in his 2022 race. Ex. G, ¶ 3; Ex. H.

### Steven House

25.     Plaintiff Steven House donates to candidates for state office. Ex. D at 106:17-22.

26.     When he makes donations, he doesn't normally look at whether the candidate has accepted voluntary spending limits. Ex. I at 14:14-19.

### LEGAL STANDARDS

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show the absence of a genuine fact issue. *See Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). If

the movant makes this showing, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* at 1518.

Plaintiffs bring a facial challenge to Section 4(5)'s constitutionality. *See* Am. Compl. (Doc. 46) at 10-11. "Facial challenges to statutes are generally disfavored as 'facial invalidation is, manifestly, strong medicine that has been employed by the Supreme Court sparingly and only as a last resort.'" *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). Accordingly, "plaintiffs bear a 'heavy burden' in raising a facial constitutional challenge." *Id.* (quoting *Finley*, 524 U.S. at 580).

## ARGUMENT

In their second claim for relief, Plaintiffs seek declaratory and injunctive relief against Section 4(5), the provision that doubles contribution limits for candidates who accept voluntary spending limits. Am. Compl. [Doc. 46] at 9-11. There are no genuine disputes of material fact concerning that provision. Because Plaintiffs cannot show that their First Amendment rights are burdened by Section 4(5), Defendants are entitled to summary judgment.

## I.    Section 4(5) does not burden Plaintiffs' First Amendment rights.

Plaintiffs argue that Section 4(5) violates their First Amendment rights. Am. Compl. [Doc. 46] ¶ 62. But Section 4(5) poses no First Amendment burden at all. As this Court held in denying the preliminary injunction, "A statutory *choice* to limit campaign speech that is offered to all candidates without discrimination entails no such burden. There is no inherent constitutional defect in a law's choice-increasing framework when, as here, it does not burden a candidate's First Amendment rights." Order (Doc. 26) at 18.

The Supreme Court and other federal courts around the country have routinely upheld laws like Section 4(5) that give candidates more choices about how to maximize their speech as long as the choice offered does not coerce candidates into accepting limits on their speech. The undisputed facts here show there is no such coercion. Far more candidates reject the voluntary spending limits than accept them. SUMF ¶¶ 8-11. And even the one Plaintiff who accepted voluntary spending limits stated that he did not feel coerced into accepting them. *Id.* ¶ 20.

## A. Laws that allow candidates to voluntarily accept spending limits in exchange for other benefits are constitutional as long as they are not coercive.

Courts have consistently upheld laws, like Section 4(5), that offer candidates a choice between accepting voluntary spending limits in exchange for a benefit, or retaining their ability to spend unlimited sums while foregoing the offered benefit. In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court upheld a system where the benefit was public financing. "Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations." *Id.* at 57 n.65. The Court held that public financing seeks "not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." *Id.* at 92-93. Thus, the public financing scheme "furthers, not abridges, pertinent First Amendment values." *Id.* at 93.

Following *Buckley*, two courts upheld systems very similar to Colorado's, where the benefit offered in exchange for voluntarily limiting spending is higher contribution limits. First, a Rhode Island gubernatorial candidate could accept contributions up to twice the normal limits from an individual (as well as public financing and other benefits) in exchange for agreeing to an expenditure limit. *See Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 30 (1st Cir. 1993). The First

Circuit found no constitutional infirmity with this so-called "cap gap." The court recognized that "the government may legitimately provide candidates with a choice among different packages of benefits and regulatory requirements." *Id.* at 39. And since "a candidate will presumably select the option which enhances his or her powers of communication and association, . . . it seems likely that the challenged statute furthers, rather than smothers, first amendment values." *Id.* So, too, here, where Colorado's more modest benefit—only a doubling of contribution limits and only if certain other criteria are met—leaves candidates free to select the option most likely to enhance their ability to speak.

Second, a district court in New Hampshire also found no First Amendment violation for an even larger contribution limit disparity than Colorado has. New Hampshire allowed candidates who accepted voluntary spending limits to accept contributions up to five times greater than non-accepting candidates. *See Kennedy v. Gardner*, No. CV 98-608-M, 1999 WL 814273 (D.N.H. Sept. 30, 1999). The court found no constitutional problem, and instead held: "The choice is a fair one—an easier time raising funds but a fixed spending limit, on the one hand, or a more difficult time raising funds but unlimited ability to spend, on the other." *Id.* at *6. "'Put another way, the state exacts a fair price from complying candidates in exchange for receipt of the challenged benefit' and 'neither penalizes certain classes of office-seekers nor coerces candidates into surrendering their First Amendment rights.'" *Id.* at *8 (quoting *Vote Choice, Inc.*, 4 F.3d at 39). Once again, Colorado's offered benefit is more modest than the benefit upheld in *Kennedy*—a 2x increase to the contribution limit rather than a 5x increase—and so poses no constitutional infirmity.

8

Several other courts have upheld systems where, as in *Buckley*, the offered benefit was public financing rather than increased contribution limits. Most recently, the Second Circuit upheld a public financing system coupled with an expenditure cap for those who opted into it. That court held heightened scrutiny did not apply to the expenditure limit because the plaintiffs could not "show that there is a burden on candidates' rights." *Corren v. Condos*, 898 F.3d 209, 227 (2d Cir. 2018). Because the system is voluntary, the Second Circuit upheld the expenditure limit even though those "restrictions . . . would otherwise be impermissible." *Id.* at 218.

Several other circuit courts have reached the same conclusion as *Corren* and upheld similar systems as long as they are not coercive. *See N.C. Right to Life Comm. v. Leake*, 524 F.3d 427, 436 (4th Cir. 2008) ("Since *Buckley* the circuit courts have generally held that public financing schemes are permissible if they do not effectively coerce candidates to participate in the scheme," and "we conclude that North Carolina's public financing system is not unconstitutionally coercive."); *Daggett v. Comm'n on Gov't Ethics & Election Practices*, 205 F.3d 445, 472 (1st Cir. 2000) ("[W]e hold that Maine's public financing scheme provides a roughly proportionate mix of benefits and detriments to candidates seeking public funding, such that it does not burden the First Amendment rights of candidates or contributors."); *Gable v. Patton*, 142 F.3d 940, 948 (6th Cir. 1998) ("In general, the public funding of candidates in return for their acceptance of expenditure limits is constitutional, . . . [as long as the] benefits [do not] snowball into a coercive measure upon a non-participating candidate.") (quotations omitted); *Rosenstiel v. Rodriguez*, 101 F.3d 1544. 1550 (8th Cir. 1996) ("Because participation [in the public financing system] is truly voluntary . . . , the Appellants' argument that their First Amendment rights are burdened is without merit."); *see also Republican Nat'l Comm. v. FEC*,

9

487 F. Supp. 280, 285 (S.D.N.Y.) (three-judge court), *aff'd mem.*, 445 U.S. 955 (1980) ("[T]he conditions imposed by Congress upon receipt of public campaign financing do not infringe upon the First Amendment rights of candidates.").

These public financing cases are directly analogous to Colorado's Section 4(5). Clearly, Colorado could incentivize candidates to accept spending limits by offering them public financing. *See Gable*, 142 F.3d at 949 ("[A] voluntary campaign finance scheme must rely on incentives for participation[.]"). Instead, Colorado incentivizes candidates to accept spending limits by allowing them to accept up to twice the normal contribution limits (if the other criteria of Section 4(5) are also met). This difference is of no constitutional import. Section 4(5) "merely provides a . . . candidate with an *additional* funding alternative which he or she would not otherwise have and does not deprive the candidate of other methods of funding which may be thought to provide greater or more effective exercise of rights of communication or association[.]" *Corren*, 898 F.3d at 219 (quoting *Republican Nat'l Comm.*, 487 F. Supp. at 285). The First Amendment rights of candidates are therefore not burdened. They remain free to choose to operate under Colorado's default campaign finance laws—which allow unlimited expenditures under the normal contribution limits—or to accept spending limits in exchange for higher contribution limits.

Plaintiffs have argued that Section 4(5) should be invalidated based on *Davis v. FEC*, 554 U.S. 724 (2008). *See, e.g.*, Mot. for Preliminary Injunction [Doc. 8] at 20-22. *Davis* invalidated the federal "Millionaire's Amendment," which increased a candidate's contribution limits when the candidate's opponent spent significant sums of their own money. But *Davis* does not control here. Unlike Section 4(5), which offers candidates a menu of benefits and detriments, the

Millionaire's Amendment automatically burdened candidates' speech "by the activation of a scheme of discriminatory contribution limits" that benefited their opponents. *Id.* at 740. By contrast, here, the opponent of a candidate who rejects spending limits still must make a strategic choice between accepting higher contribution limits and a spending limit or foregoing the higher contribution limits. No automatic burden applies. Additionally, *Davis* itself reaffirmed *Buckley*'s holding that choosing between different benefits and detriments poses no constitutional infirmity because "[i]n *Buckley*, a candidate, by foregoing public financing, could retain the unfettered right to make unlimited personal expenditures." *Id.* at 739; *accord Corren*, 898 F.3d at 228. *Davis* thus confirms that choice-increasing frameworks, like Section 4(5), do not offend First Amendment values.

**B.     Section 4(5) is not coercive.**

The cases cited above show that these choice-increasing laws do not burden First Amendment rights unless the benefits they offer are so great that candidates are effectively coerced into accepting the spending limits. "The doctrine that benefits provided to participating candidates can become unconstitutionally coercive, if they are overwhelming enough, follows logically from the holding in *Buckley* that involuntary limits on a candidate's campaign expenditures are unconstitutional." *Gable*, 142 F.3d at 948. "Thus, the central question we are faced with is whether the . . . advantage the [state law] provides to participating candidates rises to the level of unconstitutional coercion." *Id.*

The voluntary spending limits in Section 4(5) are not coercive. About 2/3 of candidates reject them. USMF ¶¶ 8-11. One of the Plaintiffs, Pelton, accepted the limits, but he didn't feel coerced into doing so, and doesn't even know why he accepted them. *Id.* ¶¶ 15, 20. Another

Plaintiff, Lopez, rejected the limits in his gubernatorial race, and so obviously was not coerced into accepting them. *Id.* ¶ 22. And the donor plaintiff, House, doesn't even pay attention to the limits when he makes contributions to candidates. *Id.* ¶ 26.  A choice rejected by most candidates, and which no witness has testified they are coerced into accepting, can hardly be coercive. *See, e.g.*, *Gable*, 142 F.3d at 944 (system not unconstitutionally coercive if the candidate can make a "financially rational decision not to participate").

Section 4(5) thus supports First Amendment values. Free to choose between alternatives, candidates will presumably select whichever method allows them to get their message out most effectively. "Since the candidate remains free to choose between funding alternatives, he or she will opt for [voluntary spending limits] only if, in the candidate's view, it will *enhance* the candidate's powers of communication and association." *Corren*, 898 F.3d at 219 (quoting *Republican Nat'l Comm.*, 487 F. Supp. at 285); *see also Rosenstiel*, 101 F.3d at 1552 ("Under this choice-increasing framework, candidates will presumably select the option that they feel is most advantageous to their candidacy. Given this backdrop, it appears to us that the State's scheme promotes, rather than detracts from, cherished First Amendment values."). Section 4(5)'s incentive is weaker than the incentive offered by public financing—it does not relieve a candidate of their need to fundraise and applies only to the subset of donors who are willing and able to donate more than the normal maximums. And since public financing's strong incentive is not coercive, Section 4(5)'s weaker incentive is also not coercive as candidates can—and most do—choose to spend unlimited amounts on their campaigns.

Far from coercing candidates into limiting their speech, Section 4(5) enhances speech. Candidates who can spend more than the expenditure limit will not accept the voluntary

spending limits, so their speech is unaffected by Section 4(5). And those candidates who expect to spend less than the voluntary spending limits will be able to speak more because they will have higher contribution limits and so can raise more money than they otherwise could. The undisputed facts show that Section 4(5) does not violate Plaintiffs' First Amendment rights to speak and associate.

## CONCLUSION

The Court should grant Defendants summary judgment on Count Two.

PHILIP J. WEISER
Attorney General

s/ Michael T. Kotlarczyk
MICHAEL T. KOTLARCZYK*
Senior Assistant Attorney General
PETER G. BAUMANN*
Assistant Attorney General
Public Officials Unit / State Services Section
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone: (720) 508-6187
Email: mike.kotlarczyk@coag.gov
        peter.baumann@coag.gov
Attorneys for Defendants Jena Griswold and Judd
  Choate
*Counsel of Record

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I served the foregoing **DEFENDANTS' MOTION FOR SUMMARY**

**JUDGMENT ON COUNT TWO** upon all parties herein by e-filing with the CM/ECF system

maintained by the Court on May 8, 2023, addressed as follows:

Ryan Ashley Morrison
Institute for Free Speech
1150 Connecticut Ave., NW, #801
Washington, DC  20036
rmorrison@ifs.org

*Attorneys for Plaintiffs*

*s/* Xan Serocki
*Xan Serocki*

**DEFENDANTS' EXHIBIT INDEX**
**FOR**
**MOTION FOR SUMMARY JUDGMENT ON COUNT TWO**

| | |
|---|---|
| A. | Colorado Secretary of State 30(b)(6) Deposition |
| B. | Defendants' Response to 2nd Set of Interrogatories |
| C. | Pelton Deposition |
| D. | Hearing Transcript of March 9, 2022 Preliminary Injunction Hearing |
| E. | Exhibit 1 to Pelton Deposition |
| F. | Plaintiffs' Response to Discovery Requests |
| G. | Declaration of Stephen Bouey, dated May 8, 2023 |
| H. | Attachment to Bouey Declaration, printout from TRACER database |
| I. | House Deposition |