IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00247-JLK

GREG LOPEZ,
RODNEY PELTON, and
STEVEN HOUSE,

    Plaintiffs,

v.

JENA GRISWOLD, Colorado Secretary of State, in her official capacity, and
JUDD CHOATE, Director of Elections, Colorado Department of State, in his official capacity,

    Defendants.

## DEFENDANTS' TRIAL BRIEF

For more than fifty years, Colorado has limited the amount any single person can donate to a candidate for state office. This effort originated in the legislature in the 1970s, but voters soon took up the mantle. In 1996, Colorado voters passed an initiative setting limits on contributions to candidates by a margin of almost two-to-one. *See* Title I, art. 45, ed.'s note, C.R.S. (2023). In 2002, the People enshrined that regime in the state constitution. *See* Colo. Const. art. XXVIII. And in doing so, they declared in the first sentence of the Amendment that their actions were driven by an interest in limiting political corruption and its appearance. *Id.* § 1.

Now, Plaintiffs ask this Court to hold that those limits violate the First Amendment. But their subjective desire to raise greater sums from a smaller pool of donors does not establish a constitutional violation. The evidence at trial will show that Colorado candidates have sufficient resources to engage in core political speech, and that Colorado is markedly different from the states in which limits have previously been struck down.

Neither Colorado's contribution limits, nor its voluntary spending limit provision, limit political speech. Candidates can raise money and speak out as much as they want. And for the minority of candidates that do choose to limit their expenditures in exchange for double contribution limits, they do so because that choice will enable them to speak more than they otherwise would have.

## FACTUAL BACKGROUND

In 2002, the people of Colorado adopted a constitutional amendment concerning campaign finance, known as Amendment 27 (now codified at Article XXVIII of the Colorado Constitution). Amendment 27 touched on many areas, but imposing contribution limits was its centerpiece. The very first sentence states: "The people of the state of Colorado hereby find and declare that large campaign contributions to political candidates create the potential for corruption and the appearance of corruption" and "that the interests of the public are best served by limiting campaign contributions." Colo. Const. art. XXVIII, § 1. And the very first substantive sections of Amendment 27 lay out the contribution limits (Section 3) and voluntary spending provisions (Section 4) at issue in this litigation.

Because Amendment 27 includes an inflationary adjustment, its limits have grown since they were enacted. Today, Colorado's contribution limits stand at $725 from any individual to a candidate for Governor, Secretary of State, State Treasurer, or Attorney General, and $225 from any individual to a candidate for State Senate, State House of Representatives, State Board of Education, Board of Regents for the University of Colorado, or District Attorney. 8 CCR 1505-6, Rule 10.17(b). Because these limits are for each primary and general election, a candidate running in both may accept up to $1,450 or $450 depending on the office they seek.

But Amendment 27 does not only concern contributions from individuals. It also establishes limits for political parties. Today, a political party may contribute $789,060 per election to any candidate for Governor, Secretary of State, Treasurer, or Attorney General, $28,395 to a candidate for State Senate, and $20,500 to any candidate for State House, Board of Education, Regent to the University of Colorado, or District Attorney. 8 CCR 1505-6, Rule 10.17.1.

Under Colorado's voluntary spending limit regime, candidates may double these contribution limits in exchange for limiting their spending, so long as at least one other candidate in their race declines voluntary spending limits and raises more than 10% of the applicable spending limit. Colo. Const. art. XXVIII, § 4. For this cycle, the spending limitations are:

| Candidate | Voluntary Spending Limit |
|---|---|
| Governor | $3,945,300 |
| Secretary of State, Treasurer, and Attorney General | $789,025 |
| State Senate | $141,975 |
| State House, State Board of Education, Regent of the University of Colorado, or DA | $102,500 |

Each election cycle, some candidates opt-in to these spending limits, and others do not. For example, of the Plaintiffs in this litigation, Mr. Lopez declined voluntary spending limits during his candidacy for Governor in 2022, Am. Compl. (Doc. No. 44-1) ¶ 26, but Representative Pelton accepted those limits during his 2022 race for State House, *id.* ¶ 31.

# ARGUMENT

**I.  Colorado's contribution limits are closely tailored to the People's express interest in limiting corruption and its appearance.**

In this action, Plaintiffs seek to overturn the will of the People and have Colorado's contribution limits declared unconstitutional. But the critical question for the Court is whether Colorado's contribution limits are so low that they "prevent candidates from 'amassing the resources necessary for effective advocacy.'" *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (quoting *Buckley v. Valeo*, 424 U.S. 1, 21 (1976)). And evidence at trial will show both that Colorado's contribution limits do not limit effective advocacy, and that incumbents do not enjoy particular success in Colorado elections as a result of the state's contribution limits.

To be sure, Plaintiffs, like many politicians, would like to raise larger sums from large campaign contributors. But that is a policy question that has been resolved by Colorado voters. The limits those voters set, with inflationary adjustments, offer candidates sufficient opportunity to engage in political speech without running afoul of the First Amendment.

### A.  Governing legal standard

It is well-established that a government may limit the amount of money a candidate for office can accept from any one person. In its seminal campaign finance case, *Buckley v. Valeo*, 424 U.S. 1, 21 (1976), the U.S. Supreme Court held that such contribution limits "involve[] little direct restraint" on a candidate's political speech, and are therefore constitutional so long "as the government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'" *Randall*, 548 U.S. at 247 (controlling op. of Breyer, J.) (quoting *Buckley*, 424 U.S. at 25). "[T]he prevention of [*quid pro quo*] corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits." *McConnell v. FEC*, 540 U.S. 93, 143

4

(2003), *overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010); *see also FEC v. Cruz*, 596 U.S. 289, 305 (2022) (making clear that the corruption in question must be *quid pro quo* corruption).

In general, courts grant deference to the limits a state has chosen, and as a result, limits vary significantly by state. *See, e.g.*, *Randall*, 548 U.S. at 248; *Buckley*, 424 U.S. at 30 (noting that the Court "has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000"). However, where "[s]uch distinctions in degree . . . amount to differences in kind," *Buckley*, 414 U.S. at 30, courts may intervene to ensure that the limits "do not harm the electoral process by preventing challengers from mounting effective campaigns against incumbent legislators," *Randall*, 548 U.S. at 249.

*Randall* set out a two-part test.[1] First, the court must consider whether certain "danger signs" indicate that a jurisdiction's limits might be so low as to undermine the electoral process. 548 U.S. at 249. Limits that are "substantially lower than . . . limits [the Supreme Court] ha[s] previously upheld," and "substantially lower than . . . comparable limits in other States," present these "danger signs." *Id.* At 253. Defendants concede that these danger signs are present for the state legislative limits. However, Defendants do not concede that both danger signs are present for statewide offices.

Absent danger signs, the court will defer to the limits set, in this case, by the People. However, if danger signs do exist, the court "must review the record independently and carefully with an eye toward assessing the [limit's] tailoring, that is, toward assessing the proportionality

---

[1] Justice Breyer's controlling opinion in *Randall* has since been endorsed by the full court. *See Thompson v. Hebdon*, 598 U.S. 1, 6 (2019).

of the restrictions." *Randall*, 548 U.S. at 249 (quotations omitted). *Randall* establishes five non-exclusive factors that assist with this assessment: (1) whether the limits "significantly restrict the amount of funding available for challengers to run competitive campaigns," (2) whether political parties must abide by the same limits as individual donors, (3) whether the state's treatment of volunteer services "aggravates the problem," (4) whether the limits are adjusted for inflation, and (5) whether special justifications warrant the low contribution limits. *Id.* at 253–61.

Ultimately, under *Randall*, the question for the Court is whether Colorado's limits are so low that they prevent effective advocacy, especially for challengers seeking to unseat incumbents.

### B. Analysis of the *Randall* factors establishes that Colorado's limits are closely drawn to Colorado's interest in combatting corruption or its appearance.

Applying the *Randall* factors to Colorado's legislative contribution limits shows that Colorado's limits are a constitutionally permissible approach to addressing the People's repeatedly expressed interest in combatting corruption or its appearance. And although the Court need not consider those factors with regards to the statewide limits, those too are constitutional under a *Randall* analysis.

#### 1. No evidence suggests Colorado's limits impair the ability of challengers to run competitive campaigns.

The first *Randall* factor asks whether Colorado's contribution limits will significantly restrict the funding available for challengers to mount effective campaigns against incumbents. Professor Douglas Spencer studies this question from a number of different angles, all of which point to the same conclusion: Colorado's contribution limits do not inhibit challengers from mounting effective campaigns. Among other things, Professor Spencer found:

6

- A regression analysis shows no statistically significant impact on incumbency reelection rates;

- Colorado's incumbency rates are in line with those found in states with higher contribution limits;

- Colorado's incumbency rate did not meaningfully change after the current limits were adopted in 2002; and

- Colorado legislative races are more competitive than the average state.

Colorado's data thus paints a clear picture that Colorado's contribution limits do not impede challengers.

### 2. Political parties are not subject to the individual contribution limits.

Unlike the Vermont limits at issue in *Randall*, Colorado's political parties are not subject to the same limits as individual donors. Instead, Colorado's statewide limit for political parties is nearly $800,000, one of the highest in the country. And state legislative candidates can receive significant, five-figure contributions. Evidence at trial will show that political parties can—and routinely do—contribute significant amounts to both statewide and state legislative races. This factor significantly favors the constitutionality of Colorado's limits.

### 3. Colorado's treatment of volunteer services does not aggravate any problems that exist with the individual limits.

In *Randall*, the Court was particularly troubled that a volunteer's travel expenses would quickly reach the legal limit, thereby impeding volunteer campaign assistance. 548 U.S. at 259–60. But in Colorado, a contribution must be "put into the possession of or provided to a candidate or someone acting on the candidate's behalf." *Keim v. Douglas Cnty. Sch. Dist.*, 399 P.3d 722, 729 (Colo. App. 2015) (interpreting Colorado's definition of "contribution," found in the Colorado Constitution, Article XXVIII, § 2(5)(a)(IV)). This possession requirement ensures that

7

a volunteer's out-of-pocket expenses are not subject to the contribution limits. Thus, unlike in Vermont, Colorado's limits do not inhibit candidates' ability to recruit and utilize volunteers.

### 4. Colorado's contribution limits are adjusted for inflation.

Again, unlike the limits addressed in *Randall*, Colorado's include an inflationary adjustment. *See* Colo. Const. art. XXVIII, § 3(13). This weighs in favor of their constitutionality.

Plaintiffs argue that Colorado's adjustment is insufficient because it only adjusts every four years and is rounded down to the nearest $25. But those policy choices are within the range of reasonableness and can be reconsidered at any time by the People. In the meantime, Colorado's limits will continue to rise as does inflation, as both the statewide and state legislative limits have since Amendment 27's enactment.

### 5. Colorado has no special justifications other than the People's own language.

At no point in this litigation has Colorado claimed a special justification beyond the People's interest in combatting corruption and its appearance. But the importance of that interest is magnified by the source of Colorado's contribution limits.

*Randall*'s animating concern was that incumbent legislators would set limits so low as to "prevent[] challengers from mounting effective campaigns." 548 U.S. at 249. No such concern exists here, where the People enacted the limits, making crystal clear that their interest was in limiting corruption and its appearance, not incumbency protection. Colo. Const. art. XXVIII, § 1.

## II. Colorado's voluntary spending limit scheme enhances political speech by offering candidates a meaningful choice about how best to maximize their campaigning.

Plaintiffs' second claim argues that an incentive Colorado created to encourage candidates to voluntarily accept spending limits is unconstitutional. When a candidate files their

8

affidavit of candidacy with the Secretary of State, they must declare whether they accept voluntary spending limits ("VSL"), in an amount determined by the Colorado Constitution, adjusted for inflation. If the candidate accepts VSL, they can accept contributions twice as large as the current contribution limits, if (1) another candidate in the same race declined VSL, and (2) the declining candidate raised more than 10% of the limit. If the candidate declines VSL, they do not get the additional benefit of higher contribution limits but suffer no penalty for their choice.

Candidates are quite good at determining whether VSL will benefit them. About 1/3 of candidates every election accept VSL. Only 3% of candidates who accept VSL spend up to the limit, but 20% of candidates who decline VSL spend over that limit. The only plaintiff in the case who has accepted VSL (Pelton) has never come anywhere near the limit.

Plaintiffs have a threshold justiciability problem with this claim. First, House does not have standing to challenge VSL because his associational rights as a contributor are not implicated—he can associate with his chosen candidate whether they accept or decline VSL. Second, Lopez and Pelton brought this claim to challenge VSL in the 2022 election. That election is now past, so their claim is moot unless they can satisfy the capable of repetition yet evading review exception.

Even if Plaintiffs can establish a justiciable claim, Colorado's VSL system easily passes constitutional muster. Many courts have upheld laws that incentivize candidates to accept spending limits by offering benefits, so long as the laws do not coerce candidates into accepting spending limits. Some courts have upheld similar regimes where candidates had a choice to

9

accept spending limits in exchange for higher contribution limits.[2] Many others, including the U.S. Supreme Court, have upheld voluntary spending regimes where the benefit that offsets the spending limits is public financing.[3] Plaintiffs rely heavily on *Davis v. FEC*, which invalidated a federal law that automatically increased the contribution limits of self-financed candidates.[4] But Colorado's law (1) doesn't implicate the right at interest in *Davis*—the right to expend personal funds on a campaign—and (2) gives all candidates the same choice between spending and contribution limits. As this Court held when denying the preliminary injunction, "[a] statutory *choice* to limit campaign speech that is offered to all candidates without discrimination entails no [First Amendment] burden. There is no inherent constitutional defect in a law's choice-increasing framework when, as here, it does not burden a candidate's First Amendment rights."[5]

The Court denied the parties' cross-motions for summary judgment on this count, determining that its evaluation of whether VSL is unconstitutionally coercive depends in part on its determination of the constitutionality of Colorado's base contribution limits. Defendants agree that if the contribution limits themselves are constitutional, then VSL cannot be unconstitutional

---

[2] *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir. 1993); *Kennedy v. Gardner*, No. CV 98-608-M, 1999 WL 814273 (D.N.H. Sept. 30, 1999).

[3] *Buckley v. Valeo*, 424 U.S. 1, 57 n.65, 92-93 (1976); *Corren v. Condos*, 898 F.3d 209, 227 (2d Cir. 2018); *N.C. Right to Life Comm. v. Leake*, 524 F.3d 427, 436 (4th Cir. 2008); *Daggett v. Comm'n on Gov't Ethics & Election Practices*, 205 F.3d 445, 472 (1st Cir. 2000); *Gable v. Patton*, 142 F.3d 940, 948 (6th Cir. 1998); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1550 (8th Cir. 1996); *Republican Nat'l Comm. v. FEC*, 487 F. Supp. 280, 285 (S.D.N.Y. 1980) (three-judge court), *aff'd mem.*, 445 U.S. 955 (1980).

[4] 554 U.S. 724 (2008).

[5] Order (Doc. 26) at 18.

if the only consequence of declining VSL is adherence to the constitutional contribution limits. Additionally, even if some or all of Colorado's contribution limits were found to be unconstitutional under Count I, VSL would not necessarily be unconstitutional, as Plaintiffs would still need to come forward with evidence that Colorado's VSL is coercing candidates despite 2/3 of all candidates rejecting it.

## CONCLUSION

Defendants respectfully request that the Court uphold Colorado's contribution limits and voluntary spending provisions.

Respectfully submitted this 31st day of May, 2024.

PHILIP J. WEISER
Attorney General

*s/ Michael T. Kotlarczyk*
MICHAEL T. KOTLARCZYK*
Senior Assistant Attorney General
PETER G. BAUMANN*
Senior Assistant Attorney General
Public Officials Unit / State Services Section
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone: (720) 508-6187
Email: mike.kotlarczyk@coag.gov
            peter.baumann@coag.gov
*Attorneys for Defendants Jena Griswold and Judd Choate*
*Counsel of Record

## CERTIFICATE OF SERVICE

I certify that I served the foregoing **DEFENDANTS' TRIAL BRIEF** upon all parties herein by e-filing with the CM/ECF system maintained by the Court on May 31, 2024, addressed as follows:

Ryan Morrison
Brett R. Nolan
Institute for Free Speech
1150 Connecticut Ave., NW, Ste 801
Washington, DC 20036

*Attorneys for Plaintiffs*

                                                        *s/* Carmen Van Pelt
                                                        *Carmen Van Pelt*