UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
DENVER DIVISION

| | |
|---|---|
| GREG LOPEZ, et. al, | |
| *Plaintiffs*, | Case No. 1:22-cv-0247-JLK |
| v. | PLAINTIFFS' TRIAL BRIEF |
| JENA GRISWOLD Colorado Secretary of State, et. al, | |
| *Defendants*. | |

Plaintiffs offer this brief to present the issues for trial, explain what the evidence will show, and state why the Court should rule in their favor. Pursuant to the Court's direction at the pretrial conference on October 5, 2023, Plaintiffs also submit a preliminary set of proposed findings of fact and conclusions of law, which is attached as Ex. 1.

ISSUES

A.  Whether Colorado's *individual* campaign contribution limits, enacted by Colo. Const. Art. XXVIII § 3 ("Contribution Limits" or "Contribution Caps"), violate the freedom of speech and assembly clauses of U.S. Const. amend. I. *See* Am. Compl., Count 1, ¶¶ 38-55 (ECF 46).

B.  Whether Colorado's asymmetric individual campaign contribution scheme, enacted by Colo. Const. Art. XXVIII § 4 ("Section 4"), violates the freedom of speech and assembly clauses of U.S. Const. amend. I. *See* Am. Compl., Count 2, ¶¶ 56-62 (ECF 46).

EXPECTED EVIDENCE AND ANALYSIS

I.   THE CONTRIBUTION LIMITS ARE UNCONSTITUTIONAL.

A.   The Contribution Limits do not serve Colorado's anticorruption interests.

"[C]ontribution limitations are permissible as long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'" *Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (*plurality op.*) (citing *Buckley v. Valeo*, 424 U.S. 1 (1976) (*per curium*)). Preventing *quid pro quo* corruption or its appearance are the only recognized government interests that are sufficiently important to justify campaign contribution limitations. *Id.*; *see also Federal Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1652 (2022) (There is "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."). Colorado must prove it has these interests to justify the Contribution Caps or the laws are unconstitutional. The state will attempt to present evidence that it does. However, plaintiffs expect to present expert testimony from Dr. David M. Primo, Ph. D, to explain there is no evidence that the Contribution Limits reduce either actual or apparent *quid pro quo* corruption. Furthermore, Dr. Primo will explain that there is no meaningful relationship between individual campaign contribution limits, *quid pro quo* corruption or its appearance, and the public's perception of government corruption anywhere in the United States.

B.   The Contribution Limits are too low under *Randall*.

Even if the Contribution Limits were necessary to prevent *quid pro corruption* or its appearance, Colorado's limits are unconstitutionally low under *Randall*.

*1.   The individual contribution limits display constitutional "danger signs."*

In *Randall*, the Supreme Court "invalidated a Vermont law that limited individual contributions" to candidates for statewide office and the legislature. *Thompson v. Hebdon*, 140 S.

- 2 -

Ct. 348, 350 (2019) (*per curiam*). "Justice Breyer's opinion for the plurality observed that 'contribution limits that are too low can . . . harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability,' by creating 'an obstacle to the very electoral fairness it seeks to promote.'" *Id.* (quoting *Randall*). Individual campaign contribution limits raise these constitutional "danger signs" when the limits are low compared to "contribution limits upheld by the Court in the past, and with those in force in other States." *Randall*, 548 U.S. at 249.

"[D]anger signs [are] present [in Colorado]. As compared with the contribution limits upheld by the [Supreme] Court in the past, and with those in force in other States, [Colorado's] limits are sufficiently low as to generate suspicion that they are" unconstitutional. *Id.* Colorado's individual contribution limit for statewide office per election cycle, *i.e.* primary and general elections combined, is $1,450. 8 CCR 1505-6 § 10.17.1(b)(1). "The lowest campaign contribution limit [the Supreme] Court has upheld remains the limit of $1,075 per two-year election cycle for candidates for Missouri state auditor in 1998. That limit translates to over $1,600 in [2019] dollars." *Thompson*, 140 S. Ct. at 350 (internal citations omitted). By now, in 2024, Colorado's "limit is well below" the lowest individual contribution limit ever approved by the Supreme Court. *Randall*, 548 U.S. at 251.

Moreover, Colorado's "individual-to-candidate contribution limit is 'substantially lower than . . . comparable limits in other States.'" *Thompson*, 140 S. Ct. at 351 (quoting *Randall*). Only Delaware "impose[s] limits on contributions to candidates for statewide office at or below" Colorado's individual limits. *Randall*, 548 U.S. at 250; Ex. 2. Otherwise, Colorado imposes the lowest contribution limits in the nation on candidates for Secretary of State or the state legislature. *See* Ex. 2.

And Colorado "fail[ed] to index for inflation." *Randall*, 548 U.S. at 252; *see also Thompson*, 140 S. Ct. at 351. Instead, the Contribution Limits increase only if inflation raises the caps over $25 during a four-year period and then that amount is "rounded down to the nearest lowest" $25. Colo. Const. Art. XXVIII § 3(13). *See infra* § IB2d.

Colorado will argue that this meets *Randall*'s required inflation adjustment. But current statewide and legislative individual contribution limits would be 18% and 52% higher, respectively, if they were adjusted for inflation every four years without rounding down.

"In sum, [Colorado's] contribution limits are substantially lower than both the limits [the Supreme Court has] previously upheld and comparable limits in other States." *Randall*, 548 U.S. at 253. Plus, its "failure to index for inflation means that [Colorado's] levels [will continue to be] far lower than [nearly all other states] regardless of the method of comparison." *Id*. at 252. "These are danger signs that [Colorado's] contribution limits may fall outside tolerable First Amendment limits." *Randall*, 548 U.S. at 253. This Court "consequently must examine the record independently and carefully to determine whether [Colorado's] contribution limits are 'closely drawn' to match the State's interests." *Id*.

*2.   The contribution limits do not pass Randall's narrow tailoring requirement.*

Whether the Contribution Limits are "narrowly tailored" depends on five factors: (1) whether the limits "will significantly restrict the amount of funding available for challengers to run competitive campaigns;" (2) whether political parties must abide by the same low limits as individual contributors; (3) whether "the lack of tailoring in the" rules governing "volunteer services" allows regulators to apply "broad definitions" of contributions to "expenses [campaign] volunteers incur, such as travel expenses, in the course of campaign activities" in States with

"very low" contribution limits; (4) whether the limits are indexed for inflation; and (5) whether there is any "special justification" that might warrant low limits. *Randall*, 548 U.S. at 248-61.

The evidence will show the Contribution Limits "are too restrictive." *Id.* at 253. "These five sets of considerations, taken together, lead" to the conclusion that Colorado's "contribution limits are not narrowly tailored," *Id.* at 261, and, therefore, unconstitutional.

> a. *The Contribution Limits significantly restrict the amount of funding available for challengers to run competitive campaigns.*

"[T]he critical question concerns not simply the *average* effect of contribution limits on fundraising but, more importantly, the ability of a candidate running against an incumbent officeholder to mount an effective *challenge*. And information about *average* races, rather than *competitive* races, is only distantly related to that question, because competitive races are likely to be far more expensive than the average race." *Id.* at 255. "[T]ypically," a "challenger must bear" "higher costs" "to overcome the name-recognition advantage enjoyed by an incumbent." *Id.* at 256. Consequently, the evidence will show that the Contribution Limits significantly restrict the amount of funding for a challenger to run a competitive campaign against incumbent office holders.

Plaintiff Lopez will testify that he has run for statewide office in the past and intends to run again in 2026. Because of his inability to self-finance his campaign, and the neutral stance the state parties and some small donor committees take during the primary election, he relies almost entirely on individuals to fund his campaigns. He will explain that the Contribution Limits prevent him from running a competitive campaign. And he will state that Section 4 puts him in a no-win situation because he must rely on standard-level contributions to spend the funds he needs to be competitive. Said differently, if he doubles the contribution limits, then Lopez is not allowed to spend the money he needs to run a competitive race. Lopez will also testify that in his

many years of Colorado political activism, he has no knowledge of any occurrence of *quid pro quo* corruption involving campaign contributions.

Plaintiff Pelton will testify he is a state senator and intends to seek reelection in 2026. He will explain that even though he is the incumbent, the Contribution Limits restrain his ability to campaign in his rural district. He will also testify that because of his poor relationship with the state party's leadership, he does not expect support from the party and anticipates a primary challenger in the next election. Accordingly, he will rely more than other incumbents on individual contributors to run an effective campaign. Pelton will acknowledge that he accepted Section 4's terms in the past because he did not believe he would need to spend over the expenditure limit to win his race. However, he knows that as costs increase and races become more competitive, he will need to raise and spend more money than the Contribution Limits and Section 4 spending caps allow, respectively. Pelton will also testify that in his many years of Colorado political activism, he has no knowledge of any occurrence of *quid pro quo* corruption involving campaign contributions.

Plaintiff House will testify that he has been involved in Colorado politics both as a political party leader and a financial contributor for many years. House will testify that he has contributed and will continue to contribute to candidates for various Colorado offices. He will state that he wants to contribute more than the Contribution Limits allow, and that in 2022 he contributed the maximum amount allowed under the Contribution Limits. And with respect to Section 4's asymmetric campaign contribution scheme, House will testify that he would have contributed double the standard contribution limits to his preferred candidates if allowed by Section 4, just as some other donors were permitted by Section 4. House will also testify that in his many years of

Colorado political activism, he has no knowledge of any occurrence of *quid pro quo* corruption involving campaign contributions.

Expert witness Benjamin Engen will explain that challenging an incumbent is difficult and that contribution limits make it harder, especially for first-time candidates. The Contribution Limits unduly harm challengers' ability to raise money, which prevents them from promoting their candidacy to voters and, therefore, conducting a competitive campaign. To illustrate, individuals donate nearly 70% of the number of contributions made to first-time candidates in legislative races. But incumbents collect only half of their contributions from individuals. Incumbent legislators, instead, receive contributions from lobbyists that control small donor committees, which can contribute over 13-times more money than individuals. Furthermore, the Contribution Caps have the insidious effect of discouraging potential first-time candidates from running for office due to an incumbent's fundraising advantage and the inability to overcome the messages produced from opposition independent expenditure committees ("IECs"). Thus, a challenger's potentially competitive race ends before it even starts due to the ingrained fundraising advantage the Contribution Limits give to incumbent politicians.

Expert witnesses Dr. Christopher Bonneau, Ph. D, and Dr. Damaon Cann, Ph. D, will explain that the more money a challenger can raise, the more competitive his campaign is against an incumbent. They will explain that campaign contributions are essential for candidates to educate voters on their issue positions. And while restrictive contribution limits reduce the ability for both challengers and incumbents to publish their political message to voters, their research shows that depressed spending disproportionately affects challengers, which makes campaigns against incumbents less competitive. Plus, Colorado incumbents are less likely to be challenged in a primary or general election because of the state's Contribution Limits.

Accordingly, the evidence creates "a reasonable inference that the contribution limits are so low that they pose a significant obstacle to candidates in competitive elections," *Randall*, 548 U.S. at 256, and that they "significantly restrict the amount of funding available for challengers to run competitive campaigns." *Id.*at 253. Therefore, this factor "counts against the constitutional validity of the contribution limits." *Id*. at 256.

Plaintiffs expect the government to present expert testimony from Dr. Douglas Spencer, Ph. D, to argue that no matter how permissive or restrictive individual campaign contributions limits are, incumbent politicians almost always win reelection. Thus, the Contribution Limits have no impact on election outcomes.

However, this evidence misses the point. *Randall* focuses on election competitiveness, not outcomes. *Id*. at 253, 255-56. Individual campaign contributions must be high enough to maintain election competitiveness to be constitutional. *Id*. Challengers may lose to incumbents in every election. But as long as the election is competitive, *Randall* is satisfied. *Id*. Colorado's focus on election outcomes is irrelevant under *Randall*.

   b. *Political party contributions have practical limitations that mitigate their theoretical impact on competitive races.*

*Randall* held that political parties should be permitted to donate more funding to their candidates than individual contributors to help the candidate run competitive campaigns. *Randall*, 548 U.S. at 256-59. Otherwise, contribution caps "would severely limit the ability of a party to assist its candidates' campaigns by engaging in coordinated spending on advertising, candidate events, voter lists, mass mailings, even yard signs. And, to an unusual degree, it would discourage those who wish to contribute small amounts of money to a party, amounts that easily comply with individual contribution limits." *Id*. at 257. However, this reasoning depends on a political party's wherewithal and willingness to contribute to its candidates.

The Contribution Limits allow political parties to contribute more money to candidates than they allow individuals to donate. *Compare* 8 CCR 1505-6 § 10.17.1(b) *with* Colo. Const. Art. XXVIII §3(d); 8 CCR 1505-6 § 10.17.1(j). But the evidence will show that both state Republican and Democrat parties prohibit contributions during primary elections. Additionally, House and Richard Wadhams will testify from their experience as Colorado Republican Party chairmen that the state party does not have the financial resources to help its candidates run competitive campaigns. Lopez and Pelton will testify that they did not receive any contributions from a political party during their most recent primary election campaigns. Pelton will state that he received a relatively small amount of funding from political party contributions for his most recent general election. And Pelton will testify that he does not anticipate additional contributions from the state level political party organization because of an intraparty dispute that he has with its leadership and his knowledge of its financial resources.

*Randall* recognizes that political parties play a role in the competitiveness of candidate's campaign. But if a political party does not have the financial resources to help its candidate run a competitive campaign, or is unwilling to do so, then the party's importance is greatly diminished. Individual contributions to political parties are limited. See 8 CCR 1505-6 § 10.17.1(d). Contributions to IECs are not. IECs can thus amass greater resources, and, consequently, assert greater influence in elections. Collectively, all political parties at the state and local level donated just over $1.7 million to candidates during the 2022 four-year election cycle. But IECs spent nearly $122.8 million over that same time period supporting and opposing various statewide and legislative candidates.

Candidates are forbidden from coordinating their message with IECs. *See* Colo. Const. Art. XXVIII §2(9); 8 CCR 1505-6 § 5.2. The candidate's lack of control over IECs' messaging can

be a detriment to his or her campaign strategy. Consequently, the candidate is more dependent on individual contributors, and the level that their contributions are limited to becomes even more important. Indeed, as demonstrated in the most recent Colorado gubernatorial election, "a candidate lacking immense personal or family wealth must depend on financial contributions from others to provide the resources necessary to conduct a successful campaign." *Buckley*, 424 U.S. at 26.

Political party contributions do not necessarily "represent a significant amount of total candidate funding" or impact "competitive races." *Randall* 548 U.S. at 254. IEC spending does. The Contribution Caps give political parties the formal capability to overcome a candidate's fundraising deficit from individual contributors. But this ability is outweighed by the party's substantive inability to do so. Therefore, this factor only superficially favors the government and should not be given much weight.

Lastly, Plaintiffs expect Colorado to argue that its political party contribution limits relative to other states' political party contribution limits are relevant for *Randall* analysis. But they are not.

The *Randall* Court's discussion of a state's political party contribution limit delt with how the limit compared to that particular state's individual contribution limit. 548 U.S. at 256-59. The Supreme Court mentioned that Vermont's political party contribution limits were the lowest in the nation. *Randall*, 548 U.S. at 251. But the discussion focused on Vermont's "individual-to-candidate contribution limit" and whether it was "'substantially lower than … the limits [the Supreme Court] previously upheld,'" "'substantially lower than … comparable limits in other States,'" and "adjusted for inflation." *Thompson*, 140 S. Ct. at 350-51 (interpreting and quoting *Randall*). Accordingly, the introduction of any non-Colorado political party contribution limit is

irrelevant and an attempt to obfuscate the fact that Colorado's individual contribution limits are unconstitutional.

### c. *The Contribution Limits' treatment of volunteer services is not properly tailored.*

Colorado treats volunteer services in the same way that Vermont did in *Randall*. The laws' text match verbatim. Vermont "exclude[d] from its definition of 'contribution' all 'services provided without compensation by individuals volunteering their time on behalf of a candidate.'" *Randall*, 548 U.S. at 259. Colorado excludes from the definition of "contribution" all "services provided without compensation by individuals volunteering their time on behalf of a candidate." Colo. Const. Art. XXVIII §2(5)(b).

"Like its federal statutory counterpart, [Colorado] excludes from its definition of contribution all services provided without compensation by individuals volunteering their time on behalf of a candidate." *Randall*, 548 U.S. at 259 (internal quotation marks and citations omitted). *Compare* Colo. Const. Art. XXVIII §2(5)(b) *with* 52 U.S.C. § 30101(B)(i). "But [Colorado] does not exclude the expenses those volunteers incur, such as travel expenses, in the course of campaign activities." *Randall*, 548 U.S. at 259; Colo. Const. Art. XXVIII §2(5)(b); 8 CCR 1505-6 § 1.6.2. "And, unlike the Federal Government's treatment of comparable requirements, [Colorado] has not (insofar as [Plaintiffs] are aware) created an exception excluding such expenses." *Randall*, 548 U.S. at 259 (citing the federal statutes that exclude "from the definition of 'contribution' volunteer travel expenses up to $1,000 and payment by political party for campaign materials used in connection with volunteer activities").

"The absence of some such exception" matters because of Colorado's "very low" contribution limits. *Id*. at 260. "That combination, low limits and no exceptions, means that a gubernatorial campaign volunteer who makes four or five round trips driving across [Colorado]

performing volunteer activities coordinated with the campaign can find that he or she is near, or has surpassed, the contribution limit. *Id*. "Such supporters will have to keep careful track of all miles driven." *Id*. "And any carelessness in this respect can prove costly, perhaps generating a headline, 'Campaign laws violated,' that works serious harm to the candidate." *Id*. "These sorts of problems are unlikely to affect the constitutionality of a limit that is reasonably high." *Id*. "But [Colorado's] contribution limits are so low, and its definition of 'contribution' so broad, that the [Contribution Limits] may well impede a campaign's ability effectively to use volunteers, thereby making it more difficult for individuals to associate in this way." *Id*.

Thus, like Vermont, Colorado regulators have broad of discretion to determine whether volunteer services during a campaign may amount to contributions, creating risk and uncertainty that the candidate may violate the state's low contribution limits by allowing volunteers to assist the campaign.

Colorado "owes its citizens precision." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1247 (10th Cir. 2023). "[A]mbiguous" volunteer service rules "offer[] only uncertainty." *Id*. at 1248. "And uncertainty amidst the threat of sanction chills the exercise of First Amendment rights." *Id*. at 1249. Indeed, "'[n]arrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—because First Amendment freedoms need breathing space to survive.'" *Id*. at 1248 (quoting *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021)) (cleaned up).

Colorado's volunteer rules are not tailored to allow First Amendment freedom to breathe. Indeed, "any person" that violates the Contribution Limits is subject to a civil penalty "of at least double and up to five times the amount contributed," and candidates are "personally liable" for penalties incurred by their campaign committees.  Colo. Const. Art. XXVIII § 10(1). *See also* 8 CCR 1505-6 § 23.3.3(c)(1). Accordingly, a candidate or volunteer may not pursue a certain

course of action to promote a political campaign for fear that the activity may be valued in an amount that violates the Contribution Limits. That "is not narrow tailoring." *Wyo. Gun Owners*, 83 F.4th at 1250.

In addition to this facial deficiency, Plaintiffs expect the manager of Colorado's campaign finance enforcement administration to testify that he is uncertain of what is and is not volunteer services, just as he did at the preliminary injunction hearing and at his deposition.

Candidates, contributors, and volunteers "need certainty and direction." *Wyo. Gun Owners*, 83 F.4th at 1249. It is not a campaign speaker's job to decipher how to comply with Colorado's byzantine campaign finance laws. "The First Amendment does not permit laws that force speakers to retain a campaign finance attorney." *Id.* at 1250 (internal quotation marks omitted). The government cannot expect them to "accept greater First Amendment burdens to remain in compliance" with the Contribution Limits. *Id.*

"Rather than leave [campaign actors] to twist in the wind, [Colorado] could have outlined" the boundaries of volunteer services. *Id.* at 1248. Indeed, it is Colorado's burden to write laws so that campaign actors easily know how to comply. *Id.* at 1250. "To comply with the First Amendment, [the Contribution Limits] must offer appropriate and precise guidance, defining how actors—sophisticated or otherwise" can avoid violating Colorado campaign finance law. *Id.* The fact that what is and what is not volunteer services remains ambiguous proves that Colorado failed to meet its tailoring burden.

"Again, the very low limits at issue help to transform differences in degree into difference in kind. And the likelihood of unjustified interference in the present context is sufficiently great that [this Court] must consider the lack of tailoring in [Colorado's] definition of 'contribution' as an

added factor counting against the constitutional validity of the contribution limits before [this Court]." *Randall*, 548 U.S. at 260.

    d.   *The contribution limits do not adjust for inflation.*

The Contribution Limits do not adjust for inflation. Beginning "in the first quarter of 2007," the Contribution Caps were "adjusted by an amount based upon the percentage change over a four-year period in the [] consumer price index for [Denver-Aurora-Lakewood]." Colo. Const. Art. XXVIII § 3(13). Thus, the adjustment is based on the amount of inflation between 2003 to 2007, 2007 to 2011, 2011 to 2015, 2015 to 2019, and 2019 to 2023, respectively. And, consequently, the Contribution Limits do not reflect cumulative inflation from 2003 to the present. Instead, the Contribution Limits reflect inflation within those four-year periods.

But the law's fatal flaw is that the adjustment must be "rounded to the nearest lowest twenty-five dollars." *Id*. As a consequence of the rounding requirement, inflation had to increase at least 5% during a requisite four-year period after the statewide limits were set at $500 per election in 2002 or they would never increase. Likewise, inflation had to increase at least 12.5% during a requisite four-year period after the legislative limits were set at $200 per election in 2002 or they would never increase. Indeed, there could have been 4.9% inflation every requisite four-year period through *infinity* beginning with the 2003 to 2007 period and the Contribution Limits would *never* increase.

A contribution limit is not adjusted for inflation if the adjusted amount must be rounded down from the actual inflation adjusted amount. And because the Contribution Limits do not reflect the real impact of inflation, the Caps are not adjusted for inflation. Since the Contribution Limits were enacted through 2023, overall cumulative inflation increased 71.5%. However, the limits for statewide and legislative candidates only increased 45% and 12.5%, respectively.

Indeed, current statewide and legislative limits would be 18% and 52% higher, respectively, if they were adjusted for inflation every four years without rounding down.

The federal government understands this principle. Congress addressed the "issue of stagnant civil monetary penalties with passage of the Improvements Act." *NRDC v. Nat'l Highway Traffic Safety Admin*., 894 F.3d 95, 111 (2d Cir. 2018) (citing Bipartisan Budget Act of 2015, Pub. L. 114-74, § 701, 129 Stat. 584, 599 (2015) (codified at 28 U.S.C. § 2461 note)). One of the "key changes" the law made was removing "the rounding methodology that had kept penalties stagnant." *Id*.

More importantly, Colorado understands how inflation adjustments should work. Indeed, Colorado annually adjusts civil penalties for inflation without a rounding system. *See e.g*., CRS 25-7-122(b)(I) (air quality violations); CRS 25-8-608(1) (water quality violations); CRS 31-16-101(1)(b) (municipal ordinance violations). And Colorado's minimum wage is adjusted annually "for inflation" and the state "must round up, to the nearest cent, any fractional cents yielded by the inflation adjustment," fully accounting for inflation and then some. 7 CCR 1103-1 § 8.9. But Colorado fails to properly index the Contribution Limits by rounding down.

"A failure to index limits means that limits which are already suspiciously low will almost inevitably become too low over time." *Randall*, 548 U.S. at 261 (citation omitted). For example, but for the rounding requirement, the per election cycle legislative limits would have increased every four years to $432, $472, $514, $572, and $686 from 2003 to 2023, respectively. Indeed, because of the $25 rounding requirement, these limits increased for the *first time* in 2023 to $450. *Compare* 8 CCR 1505-6 § 10.17.1(b)(2) (2023) *with* Colo. Const. Art. XXVIII § 3(1)(b) (2003). The Supreme Court ruled that Alaska did not adjust for inflation when its contribution

limits did not increase for over twenty years. *Thompson*, 140 S. Ct. at 351. The same is true in Colorado.

Indeed, the legislative cap increase only occurred because of a historic 19.7% inflation adjustment. *Compare* Jan. 2023 Denver-Aurora-Lakewood CPI Value (312.392) *with* Jan. 2019 Denver-Aurora-Lakewood CPI Value (260.942). For the legislative caps to ever adjust again, inflation must go up at least 12% over four years. That is a 3% annual rate. Accordingly, inflation must be higher than the Federal Reserve's annual 2% inflation target and sustain that inflationary pace while the Fed tries to lower it over four years.

Additionally, the limits for the executive branch offices do not reflect amounts indexed for inflation. The evidence will show that without the $25 rounding requirement, the contribution limits for statewide office candidates would be 18% higher than their current levels. But for the rounding requirement, the statewide Contribution Limits would have increased every four years to $1,082, $1,180, $1,284, $1,430, and $1,714 from 2003 to 2023, respectively.

"[T]he bread-and-butter approach of meeting voters face-to-face, sending them mailings, and reaching them by television and radio remain, and the costs of those methods inevitably rise over time. On top of that, the costs of hiring staff and renting space is ever increasing. As the cost of living rises so does the cost of campaigning." *Thompson v. Hebdon*, 7 F.4th 811, 822 (9th Cir. 2021) (discussing Alaska's lack of an inflation adjustment for its contribution limits). And unless the Contribution Limits keep up with inflation, candidates cannot finance a competitive campaign with individual contributions.

The same Colorado incumbents that ensure inflation is indexed for civil fines and the minimum wage are the same public officials responsible for adjusting the Contribution Limits to ensure more competitive elections. Indeed, the Contribution Limits' "failure to index 'imposes

the burden of preventing the decline upon incumbent legislators who may not diligently police the need for changes in limit levels to ensure the adequate financing of electoral challenges.'" *Thompson*, 140 S. Ct. at 351 (quoting *Randall*). Because incumbents are unlikely to meet this burden diligently and increase the Contribution Limits to help their future election opponents, the caps must be indexed for inflation without restriction to allow for competitive elections.

> e. *There is no "special justification" for the contribution limits.*

Colorado admits it has no "special justification" to "warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems" described in *Randall*. 548 U.S. at 261; Pretrial Order at 4 (ECF 97). Plaintiffs expect the manager of Colorado's campaign finance enforcement administration to testify that he reviews every campaign finance complaint, and that during his approximately 14-year tenue, none of them have concerned *quid pro quo* corruption. And the documentary evidence produced by Colorado during discovery will show the state has no evidence of historical *quid pro quo* corruption in Colorado.

Indeed, there will be no evidence in the record that shows "corruption (or its appearance) in [Colorado] is significantly more serious a matter than elsewhere." *Randall*, 548 U.S. at 261.

* * *

"These five sets of considerations, taken together, lead [] to [the] conclu[sion] that [Colorado's] contribution limits are not narrowly tailored. Rather, the [Contribution Caps] burden[] First Amendment interests by threatening to inhibit effective advocacy by those who seek election, particularly challengers; … they hamper participation in campaigns through volunteer activities; [ ] they are not indexed for inflation;" and there is no "special justification" for them. *Id*. And while the law does not "mute the voice of political parties," *id*. at 261, this is

cold comfort for a candidate that must finance his campaign with low individual contributions because his political party either is unable or unwilling to donate to him.

At bottom, Colorado "does not point to a legitimate statutory objective that might justify these special burdens." *Id*. at 261-62. The Contribution Caps "disproportionately burden[] numerous First Amendment interests, and consequently, …, violates the First Amendment." *Id.* at 262.

II.  COLORADO'S ASYMMETRIC CAMPAIGN CONTRIBUTION SCHEME IS UNCONSTITUTIONAL.

Section 4 is an asymmetric campaign contribution scheme. It requires candidates that do not limit their spending on speech to abide by the Contribution Limits but allows candidates who are willing to limit their spending on speech to collect double the limit on individual contributions.

The Tenth Circuit ruled this "provision was intended to encourage candidates to limit their expenditures." *Lopez v. Griswold*, No. 22-1082, 2023 U.S. App. LEXIS 3421 at *1 (10th Cir. Feb. 13, 2023). This purpose, in and of itself, makes the law unconstitutional. *See Buckley*, 424 U.S. at 57 ("The First Amendment denies government the power to determine" spending levels.); *Federal Election Comm'n v. Colo. Republican Fed. Campaign Comm*., 533 U.S. 431, 441 (2001) ("[W]e have routinely struck down limitations on independent expenditures by candidates.").

Even so, when someone announces her candidacy for public office, she must declare whether she will limit her spending on speech and accept Section 4's terms. *See* Section 4(3); CRS 1-45-110(1). "If a candidate accepts the applicable spending limit and another candidate for the same office refuses to accept the spending limit," then the "applicable contribution limits [in 8 CCR 1505-6 § 10.17.1] shall double for any candidate who has accepted the applicable voluntary spending limit" as long as "[a]nother candidate in the race for the same office has not accepted

the voluntary spending limit," and a "non-accepting candidate has raised more than ten percent of the applicable voluntary spending limit." Section 4(4) and (5).

Because Section 4 creates different contribution limits for candidates vying for the same public office, it is an asymmetric campaign contribution scheme. Asymmetric campaign contribution schemes are a *per se* burden on a candidate's First Amendment rights, and subject to strict scrutiny. *See Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008); *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011) ("*AFE*"); *Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014). And because Section 4 requires "contribution and spending limitations," it "pose[s] a significant threat to associational freedom," *i.e.*, a burden on contributor First Amendment rights. *Indep. Inst. v. Williams*, 812 F.3d 787, 792 (10th Cir. 2016).

Plaintiffs explained why Section 4 burdens their First Amendment rights, and why the law fails strict scrutiny in their summary judgment, *see* ECF 72, 75, 78, and supplemental briefing. *See* ECF 82, 85. Colorado never explains how Section 4 passes strict scrutiny, but, instead, avoids the issue by claiming the law does not burden plaintiffs' rights. *See* ECF 76.

This Court disagreed with both parties. Instead, this Court ruled the harm Section 4 imposed on plaintiffs' First Amendment rights was "directly related to whether the [Contribution Limits] are categorically too low to pass U.S. Constitutional muster." Order at 3 (ECF 88). Under this analysis, Section 4's constitutionality depends on whether the Contribution Limits are constitutional. *Id*. *See also id*. at 4 (the Section 4 analysis partly depends on the Contribution Cap analysis). And because the claims against the Contribution Limits are "too bound up with disputed facts," *id*. at 3 n.3, the Court denied the parties' summary judgment motions and reserved its ruling on Section 4 until trial. *Id*. at 4.

While plaintiffs maintain that Section 4 is unconstitutional as a matter of law, regardless of the constitutionality of the Contribution Limits,[1] plaintiffs' claims against Section 4 prevail under the Court's analysis as well. The government cannot force candidates to limit their "overall campaign expenditures." *Buckley*, 424 U.S. at 58. And the government cannot force candidates to comply with "contribution limits that are too low." *Randall*, 548 U.S. at 248-49. Section 4 thus offers candidates an unconstitutional Hobson's choice because no matter what they choose, the law violates their Frist Amendment rights. Because Colorado's contribution limits are too low, *see supra* § IB, Section 4 forces candidates to choose either unconstitutionally low contribution limits or an unconstitutional expenditure limitation. Regardless of their choice, candidates must suffer a First Amendment injury to run for public office. Section 4 is plainly unconstitutional.

Dated: May 31, 2024

Respectfully submitted,

/s/ Ryan Morrison
Ryan Morrison
Brett R. Nolan
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Suite 801
Washington, DC  20036
202-301-3300
rmorrison@ifs.org
bnolan@ifs.org
*Counsel for Plaintiffs*

---

[1] "[O]ut of an abundance of caution," *Dupree v. Younger*, 143 S. Ct. 1382, 1391 (2023), plaintiffs intend to make a Rule 52 motion at the close of evidence and reassert their summary judgment argument to preserve the issue for appeal.