UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
DENVER DIVISION

| | |
|---|---|
| GREG LOPEZ, et. al, | |
| *Plaintiffs*, | Case No. 1:22-cv-0247-JLK |
| v. | PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| JENA GRISWOLD Colorado Secretary of State, et. al, | |
| *Defendants*. | |

Plaintiffs submit the following proposed findings of fact and conclusion of law in anticipation of the evidence presented at trial. Plaintiffs reserve the right to amend or supplement these findings based on the evidence actually presented.

FINDINGS OF FACT

I. PARTIES AND BACKGROUND

A.  Plaintiffs

1.  Greg Lopez

Plaintiff Greg Lopez is a former candidate for statewide office in Colorado. Lopez ran for governor in 2018 and 2022. He was defeated both times in the Republican primary, and he intends to run for statewide office again in 2026. To that end, Lopez maintains an active Colorado candidate political committee for statewide office, which has up-to-date contribution and expenditure reports.

### 2. Sen. Rodney Pelton

Plaintiff State Senator Rodney Pelton is the sitting senator for Colorado's 35th district. He intends to run for re-election in 2026 and maintains an active Colorado candidate political committee with up-to-date contribution and expenditure reports.

### 3. Steven House

Plaintiff Steven House is a frequent contributor to candidates running for Colorado statewide, legislative, and other offices. Indeed, he contributed over $10,000 to various candidates (including the maximum amount to statewide and legislative candidates) during the 2014 four-year election cycle, over $14,000 to various candidates (including the maximum amount to statewide and legislative candidates) during the 2018 four-year election cycle, and over $4,700 to various candidates (including the maximum amount to statewide and legislative candidates) during the 2022 four-year election cycle. House intends to continue his financial support of various Colorado candidates for as long as he lives and, if permitted, he would contribute more than the maximum amounts allowed by the individual contribution limits or Colo. Const. Art. XXVIII § 4 ("Section 4").

## B. Colorado Campaign Finance Law

### 1. Campaign Contribution Limits

Taking effect in December 2002, Colorado Constitution Article 28, § 3 and its accompanying regulations (CCR 1505-6 § 10.17.1), establish the limits for contributions to candidates for public office for various types of donors. The *individual* campaign contribution limits ("Contribution Limits" or "Contribution Caps") apply per election cycle, which includes both the primary and general elections. *See* 8 CCR 1505-6 § 10.17.1(i)(chart)(*)(note).

The Contribution Limit for statewide office per election cycle is $1,450. 8 CCR 1505-6 § 10.17.1(b)(1). The Contribution Limit for legislative candidates is $450. 8 CCR 1505-6 § 10.17.1(b)(2).

The limits for political parties contributing to candidates for public office per election cycle are:

- Governor: $789,060

- Other statewide offices: $157,805

- State Senate: $28,395

- State House: $20,500

Colo. Const. Art. XXVIII §3(3)(d) and 8 CCR 1505-6 § 10.17.1(j).

The limits for small donor committees per election cycle are $15,650 for statewide candidates and $6,200 for legislative candidates. *See* 8 CCR 1505-6 § 10.17.1(c).

Beginning "in the first quarter of 2007 and then every four years thereafter," all limits are "adjusted by an amount based upon the percentage change over a four-year period in the [] consumer price index for [Denver-Aurora-Lakewood]," and "rounded to the nearest lowest twenty-five dollars." Colo. Const. Art. XXVIII § 3(13).

2. Asymmetric Campaign Contribution Limits

Section 4 establishes the state's asymmetric campaign contribution scheme. When someone announces their candidacy for public office, the individual must declare whether he or she will limit spending on speech and accept Section 4's terms. *See* Section 4(3); CRS 1-45-110(1). "If a candidate accepts the applicable spending limit and another candidate for the same office refuses to accept the spending limit," then the "applicable contribution limits [in 8 CCR 1505-6 § 10.17.1] shall double for any candidate who has accepted the applicable voluntary spending

limit" as long as "[a]nother candidate in the race for the same office has not accepted the voluntary spending limit," and a "non-accepting candidate has raised more than ten percent of the applicable voluntary spending limit." Section 4(4) and (5).

C.  Defendants

Defendants administer Colorado's campaign finance laws, investigate any alleged violations, and enforce any penalties for infringing on these laws.

D.  Plaintiffs' Claims

All three plaintiffs challenge the Contribution Limits under the First Amendment. Plaintiffs contend that the Contribution Limits are unconstitutionally low under *Randall v. Sorrell*, 548 U.S. 230 (2006) (plurality op.), burdening their First Amendment rights of speech and association.

Plaintiffs also challenge Section 4's asymmetric individual campaign contribution scheme under the First Amendment. Lopez and Pelton contend that the asymmetric individual campaign contribution scheme is a *per se* First Amendment violation because it "force[s] a candidate 'to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations.'" *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736 (2011) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008)) ("*AFE*"). And House contends that because contributing to political candidates is a "form of political expression," which is a "fundamental right," *Riddle v. Hickenlooper*, 742 F.3d 922, 927 (10th Cir. 2014), Section 4 unconstitutionally treats him differently than it treats contributors to the opponents of House's preferred candidates—infringing on his associational rights.

II. THE CONTRIBUTION LIMITS' SIGNIFICANCE

A.  The Contribution Limits are among the lowest in the nation.

Colorado has the lowest or next to lowest individual contribution limits in the United States.[1] Colorado has the lowest limits for secretary of state candidates and for candidates seeking legislative offices. For candidates seeking election to governor, attorney general, or treasurer, only Delaware has lower limits.

Alabama, Alaska, Indiana, Iowa, Mississippi, Nebraska, North Dakota, Oregon, Pennsylvania, Texas, Utah, and Virginia have no contribution limits.

B.  The Contribution Limits do not prevent actual *quid pro corruption* or its appearance.

Colorado has had no history of *quid pro quo* corruption involving campaign contributions either before or after the Contribution Limits were enacted. Defendants identified no examples of *quid pro quo* corruption either before or after the Contribution Limits were enacted involving campaign contributions or even any investigations into possible *quid pro quo* corruption. Plaintiffs—all three of whom are actively involved in Colorado state politics and elections—are each unaware of a single incident of *quid pro quo* corruption in Colorado electoral politics either before or after the Contribution Limits were enacted. Plaintiffs' lay witness, Richard Wadhams, a former state Republican Party chairman and active observer of Colorado state politics and elections, is likewise unaware of a single incident of campaign *quit pro quo* corruption.

Colorado's Contribution Limits do not reduce the appearance of corruption either. Individual campaign contribution limits do not prevent the appearance of corruption because the existence

---

[1] States vary in how they regulate contribution limits. Some states regulate individual contribution limits annually, others per election (treating primary and general elections separately), and others per election cycle (primary and general elections combined). Comparing these limits requires adjusting annual limits and per-election limits to reflect the total contribution limit in any given election cycle.

of such laws does not alter the public view of *quid pro quo* corruption in electoral politics. The public mistakenly views many kinds of routine (and lawful) political activities as "corrupt." And there is no relationship between a state enacting campaign finance laws (including contribution limits) and the public's perception of corruption or trust in government.

C.  The Contribution Limits create less competitive elections.

In elections for most statewide executive branch positions, challengers must be able to self-fund tens of thousands of dollars; in gubernatorial races, challengers must self-fund millions. Plaintiff Lopez self-funded his failed primary campaign with a few thousand dollars, but otherwise relied on individual donors. His primary opponent self-funded her campaign with hundreds of thousands of dollars. And had he successfully advanced to the general election, Lopez would have needed millions to compete with Governor Polis. Whether Lopez could have competed with Governor Polis relying on unlimited individual contributions is unknowable. But true competition is impossible under the current contribution limits. Someone that cannot self-fund a campaign must rely on individual contributors whether the state political party contributes the maximum amount or not. The Contribution Limits are too low to make this type of campaign competitive.

The Contribution Limits create less competitive elections because of the burden they place on challengers to incumbent office holders. Seventy percent of the contributions made in legislative races come from individuals. Challengers receive most of their funding from these individuals. Incumbents have an advantage because they typically raise only half of their campaign dollars from individual donors and gain the rest from relationships with lobbyists that control small donor committees, which can contribute over 13-times more money than

individuals. This institutional fundraising advantage that incumbents possess discourages potential first-time challengers from running and creates fewer competitive elections.

The more money a challenger can raise, the more competitive his campaign is against an incumbent. Campaign contributions are essential for candidates to educate voters on their issue positions. While restrictive contribution limits reduce the ability for challengers and incumbents to publish their political message to voters, the depressed fundraising disproportionately affects challengers, which results in fewer competitive races. Indeed, a challenger benefits more from the marginal dollar raised than does an incumbent due to the law of diminishing returns. Unlike an incumbent, challengers are often not known by the voters before the election and must spend money to raise awareness and gain the name recognition that the incumbent already has. Thus, because challengers depend on individual donors more than incumbents do, lower individual contribution limits protect incumbents from competitive races.

D.  Political party contributions do not make up for the low Contribution Limits.

Colorado allows political parties to contribute more money to candidates than individuals. *Compare* 8 CCR 1505-6 § 10.17.1(b) *with* Colo. Const. Art. XXVIII §3(d); 8 CCR 1505-6 § 10.17.1(j).

Political party contributions, however, are not a factor in primary elections because both major political parties prohibit contributions during primary elections.

In practice, the major political parties in Colorado do not contribute to all of their candidates, and the Republican Party in particular rarely provides significant support to its candidates. The Colorado Democratic Party funded many candidates in 2022 but it did not contribute to all of them. Nor did it contribute the maximum amount allowed to the candidates that it did fund. The Colorado Republican Party funded only a few candidates and contributed only a small portion of

the permitted amount to them. And it is unlikely that some candidates, like Pelton, will receive financial support from the party because of internal party disputes.

The lack of funding for political parties is greatly due to the rise of independent expenditure committees ("IECs"). Individual contributions to political parties are limited. *See* 8 CCR 1505-6 § 10.17.1(d). Contributions to IECs are not. Thus, IECs can amass greater resources, and, consequently, assert greater influence in elections. Indeed, all political parties, collectively, at the state and local level donated just over $1.7 million to candidates during the 2022 four-year election cycle. But IECs spent nearly $122.8 million over that same time period supporting or opposing various statewide and legislative candidates.

Independent expenditures, however, cannot make up for the low Contribution Limits. Candidates are forbidden from coordinating their message with IECs. *See* Colo. Const. Art. XXVIII §2(9); 8 CCR 1505-6 § 5.2. The candidate's lack of control over IECs' messaging can be a detriment to his or her campaign strategy. Consequently, candidates are more dependent on individual contributors to gather resources to produce their message.

E.  Colorado's treatment of campaign volunteers

Colorado treats volunteer services the same way Vermont did in *Randall*. The text of Colorado's law excluding volunteer services from the definition of a "campaign contribution" matches the text of Vermont's analogous law verbatim. Vermont "exclude[d] from its definition of 'contribution' all 'services provided without compensation by individuals volunteering their time on behalf of a candidate.'" *Randall*, 548 U.S. at 259 (quoting Vt. Stat. Ann., Tit. 17, § 2801(2) (2002)). Colorado excludes from the definition of "contribution" all "services provided without compensation by individuals volunteering their time on behalf of a candidate." Colo. Const. Art. XXVIII §2(5)(b). Thus, like Vermont, Colorado regulators have broad of discretion

to determine whether volunteer services during a campaign may amount to contributions, creating risk and uncertainty that the candidate may violate the state's low contribution limits by allowing volunteers to assist on the campaign.

F.   Inflation Adjustment

Colorado does not adjust the Contribution Limits for inflation. Instead, an increase only occurs if inflation raises the Contribution Limits over $25 during a four-year period and then that amount is "rounded down to the nearest lowest" $25. Colo. Const. Art. XXVIII § 3(13).

Indeed, adjustments have been based on the amount of inflation between 2003 to 2007, 2007 to 2011, 2011 to 2015, 2015 to 2019, and 2019 to 2023, respectively. And, consequently, the Contribution Limits do not reflect cumulative inflation from 2003 to the present. Instead, the Contribution Limits reflect inflation within those four-year periods.

And as a consequence of the rounding requirement, inflation had to increase at least 5% during a requisite four-year period after the statewide limits were set at $500 per election in 2002 or they would never increase. Likewise, inflation had to increase at least 12.5% during a requisite four-year period after the legislative limits were set at $200 per election in 2002 or they would never increase. Indeed, there could have been 4.9% inflation during every requisite four-year period through *infinity* beginning with the 2003 to 2007 period and the Contribution Limits would *never* increase.

Since the Contribution Limits were enacted up to 2023, overall cumulative inflation has increased 71.5%. However, the limits for statewide and legislative candidates have only increased 45% and 12.5%, respectively. Indeed, current statewide and legislative limits would be 18% and 52% higher, respectively, if they were adjusted for inflation every four years without rounding down. But for the rounding requirement, the statewide Contribution Limits would have

increased every four years to $1,082, $1,180, $1,284, $1,430, and $1,714 from 2003 to 2023, respectively.

And but for the rounding requirement, the legislative limits would have increased every four years to $432, $472, $514, $572, and $686 from 2003 to 2023, respectively. Instead, legislative Contribution Limits increased in 2023 *for the first time* since they were enacted in late 2002. *Compare* 8 CCR 1505-6 § 10.17.1(b)(2) (2023) *with* Colo. Const. Art. XXVIII § 3(1)(b) (2003). This increase was able to overcome the rounding requirement only because of historic 19.7% inflation. *Compare* Jan. 2023 Denver-Aurora-Lakewood CPI Value (312.392) *with* Jan. 2019 Denver-Aurora-Lakewood CPI Value (260.942).

Indeed, for the legislative caps to ever adjust again, inflation must go up at least 12% over four years. That is a 3% annual rate. Accordingly, inflation must be higher than the Federal Reserve's annual 2% inflation target and sustain that inflationary pace while the Fed tries to lower it over four years.

G.  There is no special justification for Colorado's low contribution limits.

Colorado admits that it has no special justification for its contribution limits. *See* Pretrial Order at 4 (ECF 97).

CONCLUSIONS OF LAW

I.  PLAINTIFFS HAVE STANDING AND THEIR CLAIMS ARE NOT MOOT.

A.  Plaintiffs have standing.

To establish standing, plaintiffs must show they "(1) [have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Shields*

*L. Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1280 (10th Cir. 2024) (internal quotation marks omitted).

Lopez and Pelton easily establish standing. As candidates in the upcoming 2026 election, low individual contribution limits and asymmetric campaign contribution schemes inflict injuries in fact on their First Amendment rights, that are traceable to the Contribution Limits and Section 4, which can be redressed with a favorable decision in this case.

As an initial matter, whether House has standing on his own is irrelevant. "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U. S. 47, 52, n. 2 (2006)). Therefore, whether House, individually, has standing is immaterial. *Id.* Even so, House, as a financial contributor to candidates, has individual standing to bring his claims.

"The First Amendment protects political association as well as political expression." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (*per curiam*). The "First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas." *Id*. (internal quotation marks and citations omitted). "Making a contribution, like joining a political party, serves to affiliate a person with a candidate." *Id*. at 22. "A contribution serves as a general expression of support for the candidate and his views." *Id*. at 21. Accordingly, contributing to political candidates is a "form of political expression"—a "fundamental right." *Riddle*, 742 F.3d at 927. House wants to contribute more than the Contribution Limits and Section 4 allow. But if he contributes an amount that violates the ordinary contribution limits or Section 4, then Colorado will force House's candidate to return the contribution, thus preventing him from exercising his First Amendment rights. *See* 8 CCR 1505-6 § 23.3.4(a)(2). Therefore, these laws create an injury to his First Amendment rights that can be redressed in this case.

B.  Plaintiffs' claims are not moot.

This case began during the 2022 election cycle. Even though that election is over, Lopez's and Pelton's claims "fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007).

The "capable of repetition, yet evading review" mootness exception applies when "(1) the challenged action ended too quickly to be fully litigated and (2) a reasonable expectation exists for the plaintiff to again experience the same injury." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1166 (10th Cir. 2023) (internal punctuation marks and citation omitted).

The Supreme Court routinely employs this mootness exception in election cases. *See, e.g., Davis*, 554 U.S. at 735; *Anderson v. Celebrezze*, 460 U. S. 780, 784 and n.3 (1983)). Indeed, "[e]lection cases often fall within this exception, because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits." *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) (collecting cases).

"Challenges to election laws may readily satisfy the first element, as injuries from such laws are capable of repetition every election cycle yet the short time frame of an election cycle is usually insufficient for litigation in federal court." *Rio Grande Found.*, 57 F.4th at 1166 (citing *Wis. Right to Life*, 551 U.S. at 462). "The second prong of the capable of repetition exception requires a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *Wis. Right to Life*, 551 U.S. at 463 (internal quotation marks and citations omitted). This prong's "bar is not meant to be high." *Rio Grande Found.*, 57 F.4th at 1166 (citing *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988)). "[T]he same controversy [is] sufficiently likely to recur when a party has a reasonable expectation that it will

again be subjected to the alleged illegality." *Wis. Right to Life*, 551 U.S. at 463 (internal quotation marks and citations omitted).

Lopez's and Pelton's claims arose from their status as 2022 candidates for statewide Colorado public office and the Colorado legislature, respectively. And because Lopez and Pelton intend to run again in 2026 and will subject to the same laws, they have standing because their claims are "capable of repetition, yet evading review." *Wis. Right to Life*, 551 U.S. at 462.

Likewise, House has a history of donating the maximum individual contribution amounts to various candidates for Colorado public office each four-year election cycle since the 2014 cycle, and he would have contributed more if allowed. Thus, the Contribution Caps limited his "fundamental right." *Riddle*, 742 F.3d at 927. In some elections, House's candidate faced an opponent that Section 4 allowed to accept double the amount House contributed, even though House wanted to contribute more. House also intends to donate the maximum amount allowed to various candidates again during the 2026 election cycle and would give over that amount if permitted by law. Accordingly, the Contribution Limits and Section 4 still limit his "fundamental right." *Id*. His claim is not moot.

II. THE CONTRIBUTION LIMITS ARE UNCONSTITUTIONALLY LOW.

A.  The contribution limits do not prevent *quid pro quo* corruption or its appearance.

Colorado must overcome several hurdles to prove its campaign finance laws are constitutional. "[C]ontribution limits, like expenditure limits, 'implicate fundamental First Amendment interests,' namely, the freedoms of 'political expression' and 'political association.'" *Randall v. Sorrell*, 548 U.S. 230, 246 (2006) (*plurality op*.) (quoting *Buckley*). "Consequently, . . . contribution limitations are permissible as long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'" *Id*. at 247 (quoting *Buckley*). Preventing *quid pro quo* corruption or its appearance are the only

recognized government interests that are sufficiently important to justify contribution limitations. *Id*.; *Federal Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1652 (2022) (There is "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."). And "*quid pro quo* corruption [is] the exchange of a thing of value for an '"official act."'" *McDonnell v. United States*, 579 U.S. 550, 574 (2016). Therefore, Colorado must prove its individual contribution limits serve these interests or the laws are unconstitutional. Because it failed to do so, the laws violate the First Amendment.

Colorado's contribution limits do not prevent *quid pro quo* corruption. The government is not being asked to prove a negative, *i.e.*, show that its laws stopped corruption from happening. But it "must do more than 'simply posit the existence of the disease sought to be cured.'" *Cruz*, 142 S. Ct. at 1653 (quoting *Colorado Republican Federal Campaign Comm'n v. FEC*, 518 U.S. 604, 618 (1996)). The government identified no examples of *quid pro quo* corruption neither before the Contribution Limits existed nor after that its exceptionally low contribution limits could prevent from happening again. Colorado thus failed to prove that its Contribution Limits are necessary to prevent *quid pro quo* corruption.

Colorado's contribution limits also do not prevent the appearance of *quid pro quo* corruption. The public's perception of corruption does not change based on the existence of campaign finance restrictions like the limits Colorado imposes on contributions. Indeed, whether a state has individual contribution limits or not is irrelevant to the public's opinion about political corruption. Rather, the public perception of *quid pro quo* corruption in electoral politics is the same whether a state has restrictive or unlimited individual contribution limits. Therefore, because there is no evidence that Colorado has ever had *quid pro quo* corruption to prevent, and the public's perception of government *quid pro quo* corruption is the same regardless of whether

a state has individual contribution limits, Colorado does not have a sufficiently important interest in establishing its individual contribution limits. Consequently, the laws violate the First Amendment.

B. Section 3's Contribution Limits are unconstitutionally low under *Randall*.

Even if the Contribution Limits were necessary to prevent *quid pro quo* corruption or its appearance, Colorado's limits are unconstitutionally low under *Randall*.

*1. The Contribution Limits exhibit danger signs.*

*Randall* analysis begins with the search for "danger signs" in a state's individual campaign contribution limits. Danger is present when a state's individual contribution limits are low compared to limits previously upheld by the Supreme Court and with those used in other states. *Randall*, 548 U.S. at 249, 253. Another danger sign exists if a state's contribution limits are not adjusted for inflation. *Id*. at 252. *See also Thompson v. Hebdon*, 140 S. Ct. 348, 351 (2019) (*per curiam*). If danger signs are present, *Randall* requires tailoring analysis. *Randall*, 548 U.S. at 253.

Colorado's individual campaign contribution limits, per election cycle, are either the second lowest or the lowest in the nation. Only Delaware ($1,200) has a lower individual campaign contribution limit than Colorado ($1,450) for candidates for Governor, Attorney General, or Treasurer. 15 De. C. § 8010(a); 8 CCR 1505-6 § 10.17.1(b)(1). No state has lower individual contribution limits than Colorado for candidates for Secretary of State ($1,450), *id*., the state house of representatives ($450), or state senate ($450). 8 CCR 1505-6 §§ 10.17.1(b).

In 2019, the Supreme Court explained the "lowest campaign contribution limit" it had ever upheld was "over $1,600." *Thompson*, 140 S. Ct. at 350 (internal citations omitted). And that 2019 "limit translates" to a higher amount "in today's dollars." *Id*. Accordingly, Colorado's

"limit is well below" any individual contribution limit ever approved by the Supreme Court. *Randall*, 548 U.S. at 251.

Colorado's individual contribution limits also have the danger sign of not adjusting for inflation.

"In sum, [Colorado's] contribution limits are substantially lower than both the limits [the Supreme Court has] previously upheld and comparable limits in other States." *Randall*, 548 U.S. at 253. Plus, its "failure to index for inflation means that [Colorado's] levels [will continue to be] far lower than [nearly all other states] regardless of the method of comparison." *Id*. at 252. "These are danger signs that [Colorado's] contribution limits may fall outside tolerable First Amendment limits." *Randall*, 548 U.S. at 253. This Court "consequently must examine the record independently and carefully to determine whether [Colorado's] contribution limits are 'closely drawn' to match the State's interests." *Id*.

2.  *The Contribution Limits are not closely drawn.*

Whether Colorado's contribution limits are properly tailored depends on five *Randall* factors: (1) whether the limits "will significantly restrict the amount of funding available for challengers to run competitive campaigns;" (2) whether political parties must abide by the same low limits as individual contributors; (3) whether "the lack of tailoring in the" rules governing "volunteer services" allows regulators to apply "broad definitions" of contributions to "expenses [campaign] volunteers incur, such as travel expenses, in the course of campaign activities" in States with "very low" contribution limits; (4) whether the limits are indexed for inflation; and (5) whether there is any "special justification" that might warrant low limits. *Randall*, 548 U.S. at 248-61.

    *a.   The contribution limits significantly restrict the amount of funding available for challengers to run competitive campaigns.*

Under *Randall*, "the critical question concerns not simply the *average* effect of contribution limits on fundraising but, more importantly, the ability of a candidate running against an incumbent officeholder to mount an effective *challenge*. And information about *average* races, rather than *competitive* races, is only distantly related to that question, because competitive races are likely to be far more expensive than the average race." *Id*. at 255. "[T]ypically," a "challenger must bear" "higher costs" "to overcome the name-recognition advantage enjoyed by an incumbent." *Id*. at 256.

Colorado's individual campaign contribution limits significantly restrict the amount of funding for a challenger to run a competitive campaign against incumbent office holders. This leads to less competitive election outcomes. Thus, the evidence creates "a reasonable inference that the contribution limits are so low that they pose a significant obstacle to candidates in competitive elections," *id.* at 256, and that they "significantly restrict the amount of funding available for challengers to run competitive campaigns." *Id.*at 253. This factor "counts against the constitutional validity of the contribution limits." *Id*. at 256.

    *b.   Political party contributions have practical limitations that mitigate their theoretical impact on competitive races.*

Political parties should be permitted to donate more funding to their candidates than individual contributors to help the candidate run competitive campaigns. *Id.* at 256-59. Otherwise, contribution caps "would severely limit the ability of a party to assist its candidates' campaigns by engaging in coordinated spending on advertising, candidate events, voter lists, mass mailings, even yard signs. And, to an unusual degree, it would discourage those who wish

to contribute small amounts of money to a party, amounts that easily comply with individual contribution limits." *Id*. at 257.

While Colorado political parties can contribute more to their candidates than individuals, party contributions do not necessarily "represent a significant amount of total candidate funding" or impact "competitive races." *Id*. at 254. Colorado's campaign finance laws give political parties the formal capability to overcome a candidate's fundraising deficit from individual contributors. But this ability is outweighed by the parties' inability or unwillingness to do so in Colorado, particularly for candidates (like Pelton) who clash with party leadership and are thus unlikely to receive party support. The major state political parties do not contribute the maximum amount allowed to their candidates, mitigating any practical effect that higher contribution limits for parties might have. And the rise of independent expenditures, which candidates have no control over, further dilutes the effect of donations a party may give to its candidates. Therefore, this factor only marginally favors the government.

### c.   *The Contribution Limits' treatment of volunteer services is not properly tailored.*

Colorado's treatment of volunteer services is identical to the treatment that the *Randall* Court found deficient in Vermont. It provides regulators with too broad of discretion to determine whether volunteer services during a campaign may amount to contributions, creating risk and uncertainty that the candidate may violate the state's exceptionally low contribution limits by allowing volunteers to assist on the campaign. Therefore, Colorado's treatment of volunteer services is not properly tailored.

Colorado "owes its citizens precision." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1247 (10th Cir. 2023). "[A]mbiguous" volunteer services rules "offer[] only uncertainty." *Id*. at 1248. "And uncertainty amidst the threat of sanction chills the exercise of First Amendment rights." *Id*. at

1249. Indeed, "'[n]arrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—because First Amendment freedoms need breathing space to survive.'" *Id*. at 1248 (quoting *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021)) (cleaned up).

Colorado's volunteer rules are not tailored to allow First Amendment freedom to breathe. Indeed, "any person" that violates the Contribution Limits is subject to a civil penalty "of at least double and up to five times the amount contributed" and candidates are "personally liable" for penalties incurred by their campaign committees.  Colo. Const. Art. XXVIII § 10(1). *See also* 8 CCR 1505-6 § 23.3.3(c)(1). Accordingly, a candidate or volunteer may not pursue a certain course of action to promote a political campaign for fear that the activity may be valued in an amount that violates the Contribution Limits. That "is not narrow tailoring." *Wyo. Gun Owners*, 83 F.4th at 1250.

"Rather than leave [campaign actors] to twist in the wind, [Colorado] could have outlined" the boundaries of volunteer services. *Id*. at 1248. Indeed, it is Colorado's narrow tailoring burden to write laws so that campaign actors easily know how to comply. *Id.* at 1250. "To comply with the First Amendment, [Colorado] must offer appropriate and precise guidance, defining how actors—sophisticated or otherwise" can avoid violating its campaign finance laws. *Id*. The fact that what is and what is not volunteer services remains ambiguous proves Colorado failed to meet its tailoring burden.

As in *Randall*, "the very low limits at issue help to transform differences in degree into difference in kind. And the likelihood of unjustified interference in the present context is sufficiently great that [this Court] must consider the lack of tailoring in [Colorado's] definition of 'contribution' as an added factor counting against the constitutional validity of the contribution limits before [this Court]." *Randall*, 548 U.S. at 260.

*d.  The contribution limits do not adjust for inflation.*

Colorado does not adjust individual contribution limits for inflation. Its rounding down requirement makes this simple mathematical adjustment impossible. This is fatal. *See id*. at 250-52, 261; *Thompson*, 140 S. Ct. at 351.

"A failure to index limits means that limits which are already suspiciously low will almost inevitably become too low over time." *Randall*, 548 U.S. at 261. (citation omitted). Indeed, current statewide and legislative Contribution Limits would be 18% and 52% higher, respectively, if they were adjusted for inflation every four years without the rounding down. Thus, Colorado's Contribution Limits, particularly its legislative caps, exemplify the principle that low limits will become too low over time without an inflation adjustment.

Indeed, Colorado's legislative Contribution Limits did not change for twenty years. The Supreme Court ruled that Alaska failed to adjust for inflation when its individual contribution limits did not increase for over twenty years. *Thompson*, 140 S. Ct. at 351. Thus, the same must be true in Colorado. It is undeniable that between 2002 and now inflation increased more than 0%. But the legislative Contribution Limits increased in 2023 *for the first time* since they were enacted in 2002. *Compare* 8 CCR 1505-6 § 10.17.1(b)(2) (2023) *with* Colo. Const. Art. XXVIII § 3(1)(b) (2003). This increase was able to overcome the rounding requirement only because of recent historic inflation, otherwise they would remain unchanged.

"[T]he bread-and-butter approach of meeting voters face-to-face, sending them mailings, and reaching them by television and radio remain, and the costs of those methods inevitably rise over time. On top of that, the costs of hiring staff and renting space is ever increasing. As the cost of living rises so does the cost of campaigning." *Thompson v. Hebdon*, 7 F.4th 811, 822 (9th Cir. 2021) (discussing Alaska's lack of an inflation adjustment for its contribution limits).

Colorado understands how inflation adjustments should work. The state annually adjusts civil penalties for inflation without a rounding system. *See e.g.*, CRS 25-7-122(b)(I) (air quality violations); CRS 25-8-608(1) (water quality violations); CRS 31-16-101(1)(b) (municipal ordinance violations). And Colorado's minimum wage is adjusted annually "for inflation" and the state "must round up, to the nearest cent, any fractional cents yielded by the inflation adjustment," fully accounting for inflation and then some. 7 CCR 1103-1 § 8.9.

The same incumbents that ensure inflation is indexed for civil fines and the minimum wage are the same public officials responsible for adjusting the Contribution Limits to ensure more competitive elections. Indeed, the Contribution Limits' "failure to index 'imposes the burden of preventing the decline upon incumbent legislators who may not diligently police the need for changes in limit levels to ensure the adequate financing of electoral challenges.'" *Thompson*, 140 S. Ct. at 351 (quoting *Randall*). Because incumbents are unlikely to meet this burden diligently and increase the Contribution Limits to help their future election opponents, the caps must be indexed for inflation without restriction to allow for competitive elections.

   *e.  There is no "special justification" for the contribution limits.*

Colorado concedes that it does not meet the fifth *Randall* factor because it lacks a special justification for imposing such low contribution limits.

* * *

*Randall*'s "five sets of considerations, taken together, lead [] to [the] concl[usion] that [Colorado's] contribution limits are not narrowly tailored. Rather, the [limits] burden[] First Amendment interests by threatening to inhibit effective advocacy by those who seek election, particularly challengers; … they hamper participation in campaigns through volunteer activities; [ ] they are not indexed for inflation;" and there is no "special justification" for them. *Randall*,

548 U.S. at 261. And while the law does not "mute the voice of political parties," *id.*, this is cold comfort for a candidate that must finance his campaign with low individual contributions because his political party either is unable or unwilling to donate.

At bottom, Colorado "does not point to a legitimate statutory objective that might justify these special burdens." *Id.* at 261-62. Its individual contribution limits disproportionately burden[] numerous First Amendment interests, and consequently, … violate[ ] the First Amendment." *Id.* at 262.

III. Section 4 violates the First Amendment.

A.  Section 4 violates the First Amendment for the same reasons as the Contribution Limits.

Section 4 requires candidates that do not limit their total spending on speech to abide by the Contribution Limits, but allows candidates who are willing to limit their spending on speech to collect double the limit on individual contributions. The government cannot force candidates to limit their "overall campaign expenditures." *Buckley*, 424 U.S. at 58. And the government cannot force candidates to comply with "contribution limits that are too low." *Randall*, 548 U.S. at 248-49. Section 4 thus offers candidates an unconstitutional Hobson's choice because no matter what they choose, the law violates their Frist Amendment rights. Because Colorado's contribution limits are too low, Section 4 forces candidates to choose either unconstitutionally low contribution limits or an unconstitutional expenditure limitation. Regardless of their choice, candidates must suffer a First Amendment injury to run for public office. Section 4 is plainly unconstitutional.

B.  Section 4's campaign finance scheme is unconstitutional.

Section 4 allows candidates competing for the same office to have different Contribution Limits. Therefore, Section 4 is an asymmetric campaign contribution scheme.

Asymmetric campaign contribution schemes are a *per se* burden on a candidate's First Amendment rights, and subject to strict scrutiny. *See Davis*, 554 U.S. at 738-40; *AFE*, 564 U.S. at 736-37, 740, 754-55; *Riddle*, 742 F.3d at 929-30. "[T]he burden imposed by [asymmetric campaign contribution schemes] is evident and inherent in the choice that confronts [ ] candidates." *AFE*, 564 U.S. at 745. As an asymmetric campaign contribution scheme, Section 4 burdens Plaintiffs' First Amendment rights. No "empirical evidence" is necessary "to determine that [Section 4] is burdensome" on First Amendment freedoms. *Id*. at 746.

And because Section 4 requires "contribution and spending limitations," it "pose[s] a significant threat to associational freedom," *i.e.*, a burden on contributor First Amendment rights. *Indep. Inst. v. Williams*, 812 F.3d 787, 792 (10th Cir. 2016).

The campaign finance schemes in *Davis*, *AFE*, and *Riddle* "failed because [they, like Section 4,] imposed different contribution limits on candidates vying for the same seat." *Riddle*, 742 at 929. Only "uniform contribution limit" laws can be "constitutional." *Id*. "Imposing different contribution [ ] limits on candidates vying for the same seat is antithetical to the First Amendment." *Davis*, 554 U.S. at 744.

The fundamental question is whether Section 4 creates "different contribution limits for candidates who are competing against each other." *Davis*, 554 U.S. at 738. Because Section 4 imposes asymmetric contribution limits on "candidates vying for the same seat," *id.* at 744, the "scheme impermissibly burdens [their] First Amendment right[s]." *Id*. at 738.

Dated: May 31, 2024

Respectfully submitted,

/s/ Ryan Morrison
Ryan Morrison
Brett R. Nolan
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Suite 801
Washington, DC  20036
202-301-3300
rmorrison@ifs.org
bnolan@ifs.org
*Counsel for Plaintiffs*